688 S.E.2d 844

**SPECTRE, LLC, Respondent,**

v.

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, League of Women Voters of Georgetown County, South Carolina Wildlife Federation, League of Women Voters of South Carolina, South Carolina Coastal Conservation League, and League of Women Voters of Charleston Areas, Appellants.**

**No. 26764.**

Supreme Court of South Carolina.

Heard Oct. 21, 2009.

Decided Feb. 1, 2010.

---

7. 3 axles × 20,000 pounds + 6,000 pounds (10% scale tolerance).

358

Chief Counsel Elizabeth Applegate Dieck and Staff Attorney Davis Whitfield–Cargile, both of SC DHEC, of North Charleston, General Counsel Carlisle Roberts, of SC DHEC, of Columbia, Evander Whitehead, of Haynsworth Sinkler Boyd, of Florence, and David E. Shipley, of University of Georgia School of Law, of Athens, GA, all for Appellant SC DHEC.

James S. Chandler and Amy E. Armstrong, both of South Carolina Environmental Law Project, for Appellants League of Women Voters of South Carolina, et al.

Ellison D. Smith, IV and Stanley E. Barnett, both of Smith, Bundy, Bybee & Barnett, of Mt. Pleasant, and James B. Richardson, Jr., of Columbia, for Respondent.

Christopher Holmes, of Mt. Pleasant, for Amicus Curiae The S.C. Tourism & Land Counsil, Christopher Kaltman DeScherer, of Southern Environmental Law Center, of Charleston, for Amicus Curiae Waccamaw Riverkeeper, and Kerry L. Murphy, of Mays, Foster, Gunter & Murphy, of Columbia, for Amici Curiae SC Landowners Association, Home Builders Association of SC and the SC Association of Realtors.

Justice PLEICONES.

Respondent Spectre, LLC's (Spectre) request for a stormwater/land disturbance permit so that it may fill 31.76 acres of freshwater wetlands in Horry County was denied by the South Carolina Department of Health and Environmental Control (DHEC). The Administrative Law Court (ALC) determined that the permit must issue as a matter of law. Because we find that DHEC properly exercised its authority under the Coastal Zone Management Act (CZMA) in denying the permit request, we now reverse.

## FACTS

### I. CZMA and CMP

As part of the CZMA, passed in 1978, DHEC was required by statute to develop a comprehensive coastal management program (CMP) for the "coastal zone," an area defined as Beaufort, Berkeley, Charleston, Colleton, Dorchester, Horry, Jasper, and Georgetown counties. *See* S.C.Code Ann. § 48–39–80. In developing the CMP, DHEC was required to develop a system whereby it was authorized to review all State and federal permits for compliance with the CMP. *Id.* DHEC developed the plan and promulgated it in accordance with procedures set forth in the CZMA. Based on its interpretation of S.C.Code Ann. § 48–39–80, DHEC conducted what is in essence a consistency review for every state and federal permit application to determine compliance with the CMP.

## II. The Spectre site

Spectre sought to develop 62.93 acres in Horry County for commercial and retail purposes. As part of the plan, Spectre proposed to fill 31.76 acres of isolated freshwater wetlands and applied to DHEC for a stormwater/land disturbance permit, as required by S.C.Code Ann. §§ 48–14–10, et seq., and S.C. Reg. 72–305. DHEC denied Spectre's application because it found the project inconsistent with various provisions of the CMP, including the following provision:

1) In the coastal zone, [Office of Ocean and Coastal Resource Management] review and certification of permit applications for commercial buildings will be based on the following policies:

b) Commercial proposals which require fill or other permanent alteration of salt, brackish or freshwater wetlands will be denied unless no feasible alternatives exist and the facility is water-dependent. Since these wetlands are valuable habitat for wildlife and plant species and serve as hydrologic buffers, providing for storm water runoff and aquifer recharge, commercial development is discouraged in these areas. The cumulative impacts of the commercial activity which exists or is likely to exist in the area will be considered.

Spectre filed a request for review by the DHEC Board as allowed by S.C.Code Ann. § 44–1–60(E) (2006). Spectre argued, *inter alia*, that (1) the land in question is not subject to the requirements of the CMP, (2) the CMP is not enforceable as it is not a valid regulation promulgated and approved by the General Assembly in accordance with the South Carolina Administrative Procedures Act (APA), and (3) there is no statutory or regulatory authority for DHEC to deny a stormwater permit based on alleged inconsistency with the CMP.[1]

The DHEC Board unanimously affirmed the denial based entirely on the policy review of the permit, i.e., the proposal was inconsistent with the CMP. The Board rejected Spectre's argument that the CMP is unenforceable because it was not

---

1. The League of Women Voters of Georgetown County and the League of Women Voters of South Carolina filed a motion to intervene in the proceedings. The Board granted their motion and they are parties to this appeal.

promulgated as a regulation pursuant to the APA. Applying the CMP, the Board found that the proposed project contravened numerous provisions and that DHEC properly denied the application since Spectre did not show an alternative analysis, that there were no feasible alternatives to the amount of fill, or an overriding public interest in the project.

Spectre appealed to the ALC which reversed the Board and concluded Spectre is entitled to the permit as a matter of law. The ALC concluded (1) the CMP policies by their own terms do not apply to the property in question, (2) the CMP is not enforceable as it is not a valid regulation promulgated in compliance with the APA, and (3) as Spectre was in compliance with the stormwater regulations, the permit must issue by operation of law.

DHEC and Intervenors appealed to the Court of Appeals. On DHEC's motion, this Court issued an order transferring the case from the Court of Appeals.

## ISSUES

I. Did the ALC err in finding that the CMP, by its own terms, does not apply to the property in question?

II. Did the ALC err in finding that, even if the CMP purports to apply to the property in question, it is unenforceable because it was not promulgated in accordance with the APA?

## DISCUSSION

### I. Did the ALC err in finding that the CMP, by its own terms, does not apply to the property in question?

The ALC found that the CMP, by its own terms, does not apply to the property in question. We disagree.

The CMP was published in the State Register in 1978 in response to the General Assembly's statutory instruction to DHEC to develop a program for the South Carolina coastal zone. *See* S.C.Code Ann. § 48–39–80. The "coastal zone" was defined to include all lands and waters in Beaufort, Berkeley, Charleston, Colleton, Dorchester, Horry, Jasper, and George-

town counties. *See* S.C.Code Ann. § 48–39–10. The ALC cites two portions of the CMP as limiting its jurisdiction.

First, the ALC noted the following passage:

In addition to the extensive areas of salt and brackish marsh within the critical areas along the South Carolina coastline, the State's coastal zone also contains over 60,000 acres of fresh-water marshes. These wetlands further up the creeks and rivers, beyond the reach of saltwater at high tides, have great diversity of plant species. They play a vitally important role in contributing nutrients to the waters which eventually reach the estuarine system (the critical areas). Fresh-water marsh areas are active filters for improving water quality, and since they are linked with the downstream system, they affect water quality in the critical areas. The fresh-water marshes are important flood buffers and also function in maintenance of salinity levels in downstream estuaries.

The ALC found the phrase "since they are linked with the downstream system" to be a limitation on the reach of the CMP and concluded the program applied "only to contiguous wetlands," i.e., those connected to saltwater and not to isolated wetlands like those located on the Spectre site.

The ALC next noted that the CMP was amended in 1993 through a set of "refinements," which he found expanded the applicability of the CMP. The refinements included the following:

The Corps of Engineers is mandated by Federal law to delineate wetlands. Once delineated by the Corps of Engineers, Coastal Council [2] manages the wetlands through the policies contained in Chapter III of the State's Coastal Zone Management Program document.

Based on the above language, the ALC noted that "[d]espite the clear language of Section III–73(e) of the CMP limiting its application to those wetlands linked with the downstream system' of coastal rivers and creeks, the Coastal Council began to regulate any wetland which was subject to the jurisdiction

---

**2.** The Coastal Council was abolished July 1, 1994 and the responsibility for administration of the Coastal Zone Management Act was transferred to the Office of Ocean and Coastal Resource Management (OCRM) in DHEC. *See* 1993 Act No. 181.

and regulation by [sic] the Army Corps" under the Clean Water Act. However, the United States Supreme Court in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (*SWANCC*), held that the Clean Water Act does not extend to bodies of water not adjacent to open water, thereby severely limiting the jurisdiction of the Army Corps of Engineers. The ALC noted that as a result of the *SWANCC* decision "DHEC lost the ability to review federal permit applications for projects involving isolated wetlands" like the Spectre site.[3]

Because the site Spectre proposes to develop is unconnected to open water and is not subject to the jurisdiction of the Army Corps of Engineers, the ALC concludes that the CMP does not apply to the site. We find the ALC's interpretation inconsistent with the CMP when read as a whole.

Chapter II of the CMP sets forth the broad scope of the program as follows:

The scope of the coastal management program and of the Coastal Council's authority is based on definitions of the geographic areas and specific resources which must be considered in development of this program. Two types of management authority are granted in two specific areas of the State. The Council has direct control through a permit program over critical areas, which are defined as coastal waters, tidelands, beaches and primary ocean-front sand dunes. Direct permitting authority is specifically limited to these critical areas. Indirect management authority of coastal resources is granted to the Council in counties containing one or more of the critical areas. This area is called the coastal zone and consists of the following counties along the South Carolina coast: Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Horry, and Jasper. The coastal zone includes coastal waters and submerged bottoms seaward to the State's jurisdictional limits as well as the lands and waters of the eight coastal counties.

The Spectre property is part of the coastal zone but is not located in a critical area. The CMP next provides the following explanation of the program policies:

---

3. We note that federal permits are not at issue in this case.

On the following pages are the Resource Policies for each of the identified Activities Subject to Management. A brief statement of findings describes why each activity is of coastal management concern. These policies are organized in three separate sections:

1) Policies for the coastal zone, including that portion outside the critical area in which the Coastal Council has indirect authority (review and certification).

2) Policies for the critical areas, where the Coastal Council has direct permit authority. . . .

3) Recommended or enhancement policies which are endorsed by the Coastal Council.

Policies 1) and 2) are those which the Coastal Council is authorized to enforce through the authority of the coastal program and the S.C. Coastal Management Act of 1977. These policies are highlighted in the text with a bold outline along the margins.

Because the Spectre site is located in the coastal zone but outside of a critical area, section 1) applies.

The CMP then provides the following passage, enclosed in bold outline:

1) In the coastal zone, OCRM review and certification of permit applications for commercial buildings will be based on the following policies:

b) Commercial proposals which require fill or other permanent alteration of salt, brackish or freshwater wetlands will be denied unless no feasible alternatives exist and the facility is water-dependent. Since these wetlands are valuable habitat for wildlife and plant species and serve as hydrologic buffers, providing for storm water runoff and aquifer recharge, commercial development is discouraged in these areas. The cumulative impacts of the commercial activity which exists or is likely to exist in the area will be considered.

## (1) Linked with the downstream system

■ The provision cited by the ALC as limiting jurisdiction is found in Section XII of the CMP, entitled "Activities in areas of special resource significance." The introduction explains the section's purpose:

The following types of areas in the South Carolina coastal zone have been identified through the resource inventory efforts of the Coastal Council and its staff as being unique and either environmentally fragile or economically significant to the coastal area and the State.... Because of this sensitivity and their role as an integral part of the coastal ecosystem, alterations in these areas are likely to have direct effects on the critical areas. Because of their value and characteristics the Coastal Council employs the *additional* resource policies presented in this section in review and certification of any permits associated with an activity in one of these areas. This is done in an effort to protect the value of the critical areas and of all coastal resources. The applicable policies for the individual activity which is proposed, as well as the general guidelines for evaluation of all projects are *also* considered by the Council and its staff in permit and project reviews in these areas.

(emphasis added). The reference to wetlands as "linked with the downstream system" follows.

Though the particular portion cited by the ALC seems to address only wetlands linked to the downstream system, there is nothing to indicate that it is meant to overrule the broader language used earlier in the CMP. To the contrary, given the language emphasized in the above section, the best reading of Section XII is that the policies were meant to complement, rather than limit, policies set out earlier in the CMP. We therefore disagree with the ALC that the above passage limits the application of the CMP to those wetlands linked with the downstream system of coastal rivers and creeks.

### (2) Delineated by the Army Corps of Engineers

■ We further disagree with the ALC as to the effect of the 1993 refinements. In finding that the CMP is inapplicable to the property in question, the ALC cited the following language as limiting application of the CMP policies to wetlands over which the Army Corps has jurisdiction: "Once delineated by the Corps of Engineers, Coastal Council manages the wetlands through the policies contained in Chapter III of the State's Coastal Zone Management Program."

The passage cited by the ALC, considered in context, does not support the ALC's interpretation. The passage provides as follows:

The South Carolina Coastal Council is required by both State and Federal law to review projects in the State's coastal zone which require State and Federal permits to determine if the project is consistent with the Coastal Zone Management Program. To provide incentive for developers to approach wetland management on a comprehensive basis, and to provide some flexibility when developing adjacent to wetlands, the Coastal Council uses a wetland master planning concept as stated below.... Wetland master planning is applied to all projects undergoing consistency certification in the coastal zone, including Section 404 wetland permits issued by the Army Corps of Engineers. The Corps of Engineers is mandated by Federal law to delineate wetlands. Once delineated by the Corps of Engineers, Coastal Council manages the wetlands through the policies contained in Chapter III of the State's Coastal Zone Management Program document.

Again, we find nothing to overrule the broad language regarding jurisdiction set forth in the original version of the CMP. In fact, the first sentence cited above seems to reaffirm the expansive application of the CMP: "The South Carolina Coastal Council is required by both State and Federal law to review projects in the State's coastal zone which require State and Federal permits to determine if the project is consistent with the Coastal Zone Management Program." This paragraph addresses the consistency review which includes, but is not limited to federal permits, and the sentences cited by the ALC follow the phrase "including Section 404 wetland permits issued by the Army Corps of Engineers." Therefore, the language regarding delineation merely expounds on consistency review of federal permits, rather than imposing a limitation on the consistency review of state permits.

Moreover, even reading the sentences cited by the ALC as imposing a limitation on review of state permits, the ALC erroneously reads into the term "delineate" a requirement that the Army Corps of Engineers have jurisdiction over the land in question. In our view, one part of the language cited above deals with the scope of the project and the other with

mapping. The term "delineate" is defined in part as "to indicate by lines drawn in the form or figure of: represent by sketch, design, or diagram." *Webster's Third Int'l Dictionary* 597 (2002). Under the ALC's own finding, the property in question contains a wetland delineated by the Army Corps of Engineers. Consequently, application of the CMP is proper.

Following the *SWANCC* decision, DHEC promulgated an emergency regulation pursuant to S.C.Code Ann. § 1-23-130. A statement accompanying the emergency regulation included the following: "The *SWANCC* decision held that the Corps does not have jurisdiction over isolated wetlands and therefore removed the Department's opportunity to issue water quality and coastal zone consistency certifications for activities in those areas." Admittedly, this statement appears to concede that DHEC lacks statutory authority to apply the CMP to isolated freshwater wetlands located in the coastal zone. As explained below, we believe DHEC misread *SWANCC* when it promulgated this regulation.

The *SWANCC* decision affected the ability of the federal government to require permits for filling isolated wetlands. *SWANCC*, 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576. However, as noted above, federal jurisdiction is not essential to consistency review. Under S.C.Code Ann. § 48-39-80, DHEC possessed authority to review both federal and state permits for consistency. Though certain DHEC documents overlook the agency's authority to review state permits, statements by agency employees alone may not abrogate the authority granted by statute. *See City of Rock Hill v. South Carolina Dep't of Health and Envtl. Control*, 302 S.C. 161, 165, 394 S.E.2d 327, 330 (1990) (noting that DHEC, as a creature of statute, possesses only those powers specifically delineated); *Carolina Nat. Bank v. State*, 60 S.C. 465, 38 S.E. 629, 633 (1901) (officer could not vary authority granted by statute).

We find that the ALC erred in finding that the CMP, by its own terms, does not apply to the site in question in the instant case. The language of the CMP sets forth broad jurisdiction over the coastal zone, thereby supporting DHEC's interpretation of the CMP as applicable to the Spectre site.

**II. Did the ALC err in finding that, even if the CMP purports to apply to the property in question, it is unenforceable because it was not promulgated in accordance with the APA?**

The ALC found that the CMP is not enforceable as it is not a regulation passed in accordance with the APA. We disagree.

The ALC noted that the CMP, as promulgated by DHEC, is not a regulation under South Carolina law. DHEC does not dispute this finding.[4] The APA provides the following:

"Regulation" means each agency statement of general public applicability that implements or prescribes law or policy or practice requirements of any agency. Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law.

S.C.Code Ann. § 1–23–10(4) (2008). According to the ALC, because the CMP was not issued as a regulation, it does not have the force and effect of law and consequently, DHEC may not enforce it. We find that there is no requirement that the CMP be promulgated as an APA regulation.

As noted, the General Assembly enacted the CZMA which required DHEC to "develop a comprehensive coastal management program, and thereafter have the responsibility for enforcing and administering the program in accordance with the provisions of this chapter and any rules and regulations promulgated under this chapter." S.C.Code Ann. § 48–39–80. The statute further provides that, in developing the program, DHEC shall "[d]evelop a system whereby the department shall have the authority to review all state and federal permit applications in the coastal zone, and to certify that these do not contravene the management plan." *Id.* The CZMA set out specific procedures DHEC must follow in enacting the CMP, which included statewide hearings and public review of DHEC documents. *See* S.C.Code Ann. § 48–39–90(A), (B). After conducting the hearings and considering input from interested parties, the statute required DHEC to submit the final version of the CMP to the Governor and General Assembly for approval. *See* S.C.Code Ann. § 48–39–90(C). After review and approval by the Governor and General Assembly, "the

---

4. DHEC does argue that the CMP is the equivalent of a regulation but does not contend that it was passed in accordance with APA procedures.

proposed plan shall become the final management plan for the State's coastal zone." S.C.Code Ann. § 48–39–90(D).

DHEC developed the CMP and promulgated it in accordance with the requirements of S.C.Code Ann. § 48–39–90. Respondent argues, and the ALC found, that DHEC's compliance with § 48–39–90 is insufficient to create an enforceable plan.

### (1) Consistency Review

■ The ALC found that DHEC consistency review required by § 48–39–80(B)(11) is to be governed, not by the CMP itself, but by separate regulations DHEC would create and promulgate in accordance with the APA. The ALC noted:

> There is nothing in the [CZMA] or the CMP implying that regulations for the consistency certification process are to be promulgated in the CMP document itself. In fact, in the Legal Authorities section of the CMP, at p.V–1 and 2, entitled "Authority Outside Critical Areas," it says "All agencies currently exercising regulatory authority in the coastal zone shall administer such authority in accordance with the provisions of this act and the rules and regulations promulgated thereunder." [citation omitted]. This language can only refer to coastal zone consistency certification by the agency of state permits in the coastal counties. The CMP document itself, therefore, contemplated promulgation of regulations governing certification as well as regulations governing critical areas.

Spectre also advances this view and cites the case of *Captain's Quarters Motor Inn, Inc. v. South Carolina Coastal Council,* 306 S.C. 488, 413 S.E.2d 13 (1992), for the proposition that where an agency is authorized to promulgate certain regulations, it may not impose requirements by other means. We find *Captain's Quarters* inapplicable as it involved a specific statutory directive for DHEC to publish final rules and regulations, unlike the instant case. *Id.* at 490–491, 413 S.E.2d at 14.

In our view, the language of § 48–39–80 supports DHEC's view that the General Assembly meant the CMP policies themselves to be enforceable in the consistency review of state and federal permits. As noted above, § 48–39–80 requires DHEC to develop a comprehensive coastal management pro-

gram which it will enforce "in accordance with this chapter and any rules and regulations promulgated under this chapter." S.C.Code Ann. § 48–39–80. Though § 48–39–80 specifically requires DHEC to "[p]rovide a *regulatory system* which the department shall use in providing for the orderly and beneficial use of the critical areas," it requires only that DHEC "[d]evelop a *system*" for reviewing state and federal permit applications in the coastal zone for CMP consistency. S.C.Code Ann. § 48–39–80(A), (B)(11) (emphasis added). Had the General Assembly intended to require DHEC to promulgate regulations, it could have so specified. Moreover, the stringent requirements for enactment of the CMP, as outlined above, suggest that the General Assembly did not believe it was meant to be an unenforceable document.

Spectre also argues that the case of *Responsible Economic Development v. South Carolina Dep't of Health and Environmental Control*, 371 S.C. 547, 641 S.E.2d 425 (2007), may be interpreted as barring DHEC's consistency review of stormwater permits. We find *Responsible Economic Development* distinguishable from the instant case as the Court noted specifically that:

> [r]elevant to this appeal, the regulations of the Pollution Control Act . . . and the regulations of the Stormwater Act . . . do not reference each other and are authorized by different enabling acts. In the absence of statutory authorization to apply the two acts and their corresponding regulations to each other, the regulations of the Pollution Control Act do not apply to the Stormwater Act or its regulations.

*Id.* at 553, 641 S.E.2d at 428. The instant case differs from *Responsible Economic Development* because § 48–39–80 provides explicit statutory authorization to apply the CMP to state permits. When a state stormwater permit is sought, DHEC is authorized to enforce the CMP.

For the above reasons, we disagree with the ALC's determination that the General Assembly intended for the promulgation of separate regulations to govern consistency certification.

**(2) Effect of APA**

▇ The ALC also holds that because DHEC employs the CMP policies like regulations, they must be promulgated in

accordance with the APA before they may be enforced. In essence, the ALC holds that S.C.Code Ann. § 1–23–10(4), which provides that "[p]olicy or guidance issued by an agency other than in a regulation does not have the force and effect of law," repealed the enactment procedure set forth in S.C.Code Ann. § 48–39–90. Consequently, because the CMP did not comply with the APA, the CMP is not enforceable. We disagree. The General Assembly created a separate and more rigorous procedure for promulgation of the CMP and, because DHEC acted in accordance with the specified procedure, the plan is valid.

 "Repeal by implication is disfavored, and is found only when two statutes are incapable of any reasonable reconcilement." *Capco of Summerville, Inc. v. J.H. Gayle Const. Co., Inc.,* 368 S.C. 137, 141–42, 628 S.E.2d 38, 41 (2006), citing *Mims v. Alston,* 312 S.C. 311, 440 S.E.2d 357 (1994). Moreover, the repugnancy must be plain, and if the two provisions can be construed so that both can stand, a court shall so construe them. *Id.,* citing *City of Rock Hill v. South Carolina DHEC,* 302 S.C. 161, 167, 394 S.E.2d 327, 331 (1990). Where there is one statute addressing an issue in general terms and another statute dealing with the identical issue in a more specific and definite manner, the more specific statute will be considered an exception to, or a qualifier of, the general statute and given such effect. *Wilder v. South Carolina Hwy. Dep't,* 228 S.C. 448, 90 S.E.2d 635 (1955); *see also Wooten ex rel. Wooten v. S.C. Dep't of Transp.,* 333 S.C. 464, 468, 511 S.E.2d 355, 357 (1999) (a specific statutory provision prevails over a more general one).

Section 48–39–90 constitutes a specific enactment procedure for the CMP with more rigorous requirements than those in the APA. Under the APA, proposed regulations go into effect 120 days after they are submitted to the appropriate House and Senate Committees upon publication in the State Register unless they are affirmatively vetoed by the legislature. *See* S.C.Code Ann. § 1–23–120(D). In contrast, § 48–39–90 requires that the General Assembly and Governor affirmatively approve of the CMP before it is effective. *See* S.C.Code Ann. § 48–39–90.

This reading better comports with the history of the CZMA and APA. The two acts were passed in the same year. *See*

1977 Act No. 123; 1977 Act No. 176. The General Assembly was fully aware of the APA and in fact references it in the CZMA, directing the Coastal Council to promulgate rules and regulations addressing critical areas in accordance with the APA. *See* S.C.Code Ann. § 48–39–130(B) (2008). The General Assembly would not have established the rigorous enactment requirements of the CMP if it believed that the subsequent enactment of the APA would render it ineffective.

We find that the ALC erred in holding that, because the CMP was not promulgated in accordance with the APA, it is unenforceable. The CMP was enacted in accordance with the specific procedures set forth by the General Assembly in § 48–39–90 and, consequently, is valid and enforceable.

## CONCLUSION

We find that the ALC erred in finding that the CMP, by its own terms, does not apply to the property in question and in finding that the CMP is not enforceable. Consequently, the ALC erred in finding that the stormwater permit must issue by operation of law. We therefore reverse the ALC.

TOAL, C.J., WALLER, BEATTY and KITTREDGE, JJ., concur.