772 S.E.2d 177

TRIDENT MEDICAL CENTER, LLC, d/b/a Berkeley Regional Medical Center, Appellant/Respondent,

v.

SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL and Roper St. Francis Hospital–Berkeley, d/b/a Roper St. Francis Hospital,

Of Whom South Carolina Department of Health and Environmental Control is the Respondent and Roper St. Francis Hospital is the Respondent/Appellant.

Trident Medical Center, LLC, d/b/a Berkeley Regional Medical Center, Appellant/Respondent,

v.

South Carolina Department of Health and Environmental Control and Roper St. Francis Hospital–Berkeley, d/b/a Roper St. Francis Hospital,

Of whom South Carolina Department of Health and Environmental Control is the Respondent and Roper St. Francis Hospital is the Respondent/Appellant.

CareAlliance Health Services and Roper St. Francis Hospital–Berkeley, Respondents/Appellants,

v.

South Carolina Department of Health and Environmental Control and Trident Medical Center, LLC,

Of whom South Carolina Department of Health and Environmental Control is the Respondent and Trident Medical Center, LLC, is the Appellant/Respondent.

Appellate Case No. 2012–213506.
No. 5297.

Court of Appeals of South Carolina.

Heard Oct. 7, 2014.
Decided Feb. 18, 2015.
Withdrawn, Substituted and Refiled May 6, 2015.
Certiorari Denied Dec. 18, 2015.

David B. Summer Jr., William R. Thomas, and Faye A. Flowers, all of Parker Poe Adams & Bernstein LLP, of Columbia, for Appellant/Respondent.

William Marshall Taylor Jr., Ashley Caroline Biggers, and Vito Michael Wicevic, all of Columbia, for Respondent South Carolina Department of Health and Environmental Control.

James G. Long III and Jennifer J. Hollingsworth, both of Nexsen Pruet, LLC, of Columbia, for Respondents/Appellants.

GEATHERS, J.

These cross-appeals involve a decision of the South Carolina Administrative Law Court (ALC) upholding the issuance by the South Carolina Department of Health and Environmental Control (DHEC) of a Certificate of Need (CON) for hospital construction in Berkeley County to both Roper St. Francis Hospital–Berkeley (Roper) and Trident Medical Center, LLC (Trident) pursuant to the State Certification of Need and Health Facility Licensure Act, S.C.Code Ann. § 44–7–110 to – 394 (2002 and Supp. 2014) (the CON Act). Trident challenges the issuance of a CON to Roper, arguing the "Bed Transfer Provision" in the 2008–2009 State Health Plan prohibits DHEC from issuing a CON for the transfer of beds from Roper's hospital in downtown Charleston to a hospital that has not yet been built.

On the other hand, Roper's primary position is that the ALC's decision should be affirmed in its entirety, but if this court accepts Trident's argument and reverses the issuance of a CON to Roper, then the issuance of a CON to Trident must also be reversed. Because we affirm the ALC's decision to uphold the issuance of a CON to both Roper and Trident, we need not address Roper's appeal issue.

## FACTS/PROCEDURAL HISTORY

In 2008, Berkeley County's estimated population was 158,-140. However, there were (and still are) no acute care hospital beds licensed in Berkeley County. On August 13,

2008, Trident submitted an application for a CON to build a new fifty-bed acute care hospital in the Town of Moncks Corner in central Berkeley County pursuant to the 2004–2005 State Health Plan.[1] The 2004–2005 State Health Plan's inventory of general hospitals indicated that Trident's existing North Charleston facility had a need for forty-two additional beds,[2] and Trident sought to use this facility-specific need to obtain DHEC's approval for the proposed fifty-bed facility in Moncks Corner pursuant to a provision in the State Health Plan referred to as the "Fifty Bed Rule." This provision allows a hospital with a need for beds to add up to the greater of fifty beds or the actual projected number of needed beds to its inventory to provide for a cost-effective addition:

> Should there be a need shown for additional beds for a hospital, then an increase may be approved. In order to provide for a cost-effective addition, up to the greater of 50 beds or the actual projected number of additional beds may be approved, provided the hospital can document and demonstrate the need for additional beds.

Chapter II.G.1 § (A)(4)(d), 2004–2005 State Health Plan (Fifty Bed Rule).

Trident proposed to build the new hospital on a twenty-one acre site adjacent to its existing freestanding emergency department and outpatient center, Moncks Corner Medical Center. Trident indicated it planned to convert the building that houses the emergency department into a medical office building and move the emergency department into the new hospital.

---

1. The 2008–2009 State Health Plan did not become effective until September 12, 2008. *See* S.C.Code Ann. Regs. 61–15 § 504 (2011) (amended 2012) ("All decisions on [CON] applications shall be made based on the currently approved State Health Plan in effect at the time such application is accepted. Should a new plan be adopted during any phase of the review or appeals process, the applicant shall have the option of withdrawing the application and resubmitting under the newly adopted plan or continuing the review or appeal process under the plan in use when the application was submitted.").

2. Trident explains that due to a "prior conversion of nursing home beds to hospital beds, [its North Charleston facility] actually had a bed need of [seventeen]" when it filed the CON application for the proposed hospital in Moncks Corner.

A few months after Trident's CON submission, on December 10, 2008, Roper submitted an application for a CON to transfer some of its existing beds in its facility in downtown Charleston to a proposed new fifty-bed acute care hospital in the City of Goose Creek in southern Berkeley County pursuant to the Bed Transfer Provision of the 2008–2009 State Health Plan.[3] The Bed Transfer Provision allows for the transfer of beds between affiliated hospitals in order to serve their patients in a more efficient manner, provided certain conditions are met. *See infra.* The new hospital is to be known as "Roper St. Francis Hospital–Berkeley."

■ On May 21, 2009, DHEC conducted a joint project review hearing on the two applications. On June 26, 2009, DHEC approved both applications. DHEC also determined that Trident and Roper were not "competing applicants" and, thus, it could properly grant CONs to both. The term "competing applicants" is defined in section 44–7–130(5) of the South Carolina Code (2002) as

> two or more persons or health care facilities as defined in this article who apply for [CONs] to provide similar services or facilities in the same service area within a time frame as established by departmental regulations and *whose applications, if approved, would exceed the need for services or facilities.*

(emphasis added). When DHEC is considering competing applications, it must award a CON on the basis of which applicant most fully complies with the CON Act, the State Health Plan, project review criteria,[4] and applicable DHEC regulations. S.C.Code Ann. § 44–7–210(C) (2002) (amended 2010).

On July 6, 2009, Trident submitted two requests for final review conferences before DHEC's board (the Board), seeking

---

3. Chapter II.G.1 § (A)(4)(j), 2008–2009 State Health Plan (Bed Transfer Provision).

4. There are thirty-three criteria for DHEC's review of a project. S.C.Code Ann. Regs. 61–15 § 802 (2011) (amended 2012). Each section of Chapter II of the State Health Plan designates the most important project review criteria for the particular type of facility or service addressed in that section. Chapter I.H, 2008–2009 State Health Plan; Chapter I.I, 2004–2005 State Health Plan.

(1) a reversal of the staff's decision to grant a CON to Roper, and (2) a determination that Trident and Roper were "competing applicants" and Trident was the applicant that most fully complied with the CON Act, the State Health Plan, project review criteria, and applicable DHEC regulations. On July 10, 2009, Roper also filed a request for a final review conference before the Board, seeking a determination that Roper was the applicant that most fully complied with the CON Act, the State Health Plan, project review criteria, and applicable DHEC regulations in the event the Board found Trident and Roper to be competing applicants. The Board declined to conduct final review conferences.

On August 7, 2009, Trident and Roper collectively filed three separate requests for a contested case review before the ALC. Trident sought (1) reversal of DHEC's determination that Trident and Roper were not competing applicants and (2) reversal of DHEC's issuance of a CON to Roper. Roper sought a decision either upholding DHEC's issuance of CONs to both applicants or finding that Roper was the applicant that most fully complied with the CON Act, the State Health Plan, project review criteria, and applicable DHEC regulations.

The ALC consolidated the proceedings for trial and discovery purposes. Beginning on January 30, 2012, the ALC conducted a contested case hearing that lasted through February 16, 2012. Prior to receiving testimony, the ALC granted Roper's motion for partial summary judgment, concluding that if the applicants were found to be competing, the matter would be remanded to DHEC for identification of the applicant that most fully complied with the CON Act, the State Health Plan, project review criteria, and applicable DHEC regulations.

On September 26, 2012, the ALC issued a written decision upholding DHEC's issuance of a CON to both Trident and Roper. In its decision, the ALC deferred to DHEC's interpretation of the Bed Transfer Provision and the Fifty Bed Rule and found that if both applications were approved, they would not exceed the need for acute care hospital beds in the area. On October 5, 2012, Trident filed a motion for reconsideration, which was denied on November 1, 2012. These appeals followed.

### ISSUES ON APPEAL

1. Did the ALC err in deferring to DHEC's interpretation of the Bed Transfer Provision?

2. Did the ALC err in concluding that Trident and Roper were not competing applicants?

### STANDARD OF REVIEW

The Administrative Procedures Act governs the standard of review from a decision of the ALC, allowing this court to

reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) affected by other error of law; (e) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1-23-380(5) (Supp.2014). "An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion that is without evidentiary support." *Fields v. Reg'l Med. Ctr. Orangeburg*, 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005).

Further, this court may not substitute its judgment for the judgment of the ALC as to the weight of the evidence on questions of fact. *Spartanburg Reg'l Med. Ctr. v. Oncology & Hematology Assocs. of S.C., LLC*, 387 S.C. 79, 89, 690 S.E.2d 783, 788 (2010) (citing § 1-23-380(5)).[5] In a nutshell, this court's review "is limited to determining whether the findings were supported by substantial evidence or were controlled by an error of law." *Hill v. S.C. Dep't of Health & Envtl. Control*, 389 S.C. 1, 9, 698 S.E.2d 612, 617 (2010).

---

**5.** "The ALC presides over the hearing of a contested case from DHEC's decision on a CON application and serves as the finder of fact." *Spartanburg Reg'l*, 387 S.C. at 89, 690 S.E.2d at 788.

## LAW/ANALYSIS

### I. Bed Transfer Provision

Trident does not challenge any of the ALC's findings of fact. Rather, Trident maintains that the ALC committed an error of law in deferring to DHEC's interpretation of the Bed Transfer Provision. Trident argues the Bed Transfer Provision prohibits DHEC from issuing a CON for the transfer of beds from an existing hospital to a hospital that has not yet been constructed. To address this argument, we will first discuss the general provisions governing CONs and then focus on the Bed Transfer Provision and the section of the 2008–2009 State Health Plan in which this provision can be found.

*Background*

The purpose of the CON Act is to "promote cost containment, prevent unnecessary duplication of health care facilities and services, guide the establishment of health facilities and services [that] will best serve public needs, and ensure that high quality services are provided in health facilities in this State." S.C.Code Ann. § 44–7–120 (2002). To achieve these purposes, the CON Act requires (1) the issuance of a CON before undertaking a project prescribed by the CON Act; (2) the adoption of procedures and criteria for submitting a CON application and for review before issuing a CON; (3) the preparation and publication of a State Health Plan; and (4) the licensing of health care facilities. *Id.* DHEC is designated the sole state agency for control and administration of the CON program and licensing of health facilities. S.C.Code Ann. § 44–7–140 (2002). A person or health care facility must obtain a CON before, among other things, establishing a new health care facility or changing the existing bed complement of a health care facility. S.C.Code Ann. § 44–7–160 (2002) (amended 2010).

With the advice of a health planning committee, of which most of the members are appointed by the Governor, DHEC must prepare a State Health Plan for use in administering the CON program. S.C.Code Ann. § 44–7–180(A), (B) (2002) (amended 2010). The State Health Plan must include

(1) an inventory of existing health care facilities, beds, specified health services, and equipment; (2) projections of

need for additional health care facilities, beds, health services, and equipment; (3) standards for distribution of health care facilities, beds, specified health services, and equipment including scope of services to be provided, utilization, and occupancy rates, travel time, regionalization, other factors relating to proper placement of services, and proper planning of health care facilities; and (4) a general statement as to the project review criteria considered most important in evaluating [CON] applications for each type of facility, service, and equipment, including a finding as to whether the benefits of improved accessibility to each such type of facility, service, and equipment may outweigh the adverse [e]ffects caused by the duplication of any existing facility, service, or equipment.

§ 44–7–180(B). The State Health Plan must also include projections and standards for certain health services and equipment having "a potential to substantially impact health care cost and accessibility." *Id.*

■ DHEC is required to submit the State Health Plan to the Board for final revision and adoption at least once every two years. S.C.Code Ann. § 44–7–180(C). Finalization of the State Health Plan requires a public comment period and a public hearing. *Id.* ("[DHEC] shall adopt by regulation a procedure to allow public review and comment, including regional public hearings, before adoption or revision of the plan."). Because the legislature has required these stringent requirements for the State Health Plan's implementation, it is clear the legislature intended for the State Health Plan to be an enforceable document. *Cf. Spectre, LLC v. S.C. Dep't of Health & Envtl. Control,* 386 S.C. 357, 371, 688 S.E.2d 844, 851 (2010) (noting the stringent requirements for DHEC's enactment of the Coastal Management Program "suggest that the General Assembly did not believe it was meant to be an unenforceable document"); *id.* at 371–72, 688 S.E.2d at 851–52 (rejecting the argument that because the promulgation of the Coastal Management Program did not comply with the Administrative Procedures Act, the Coastal Management Program was not enforceable and noting the legislature "created a separate and more rigorous procedure for promulgation of the [Coastal Management Program] and, because DHEC act-

ed in accordance with the specified procedure, the [Coastal Management Program] is valid").

The State Health Plan has designated four regions of the state for the purpose of keeping an inventory of health facilities and services. *E.g.,* Chapter II.A, 2008–2009 State Health Plan. Each region is further divided into service areas. *Id.* In the 2008–2009 State Health Plan and the 2004–2005 State Health Plan, most service areas consist of individual counties. However, in the 2008–2009 State Health Plan, two service areas consist of multiple counties: (1) the Tri–County Service Area, consisting of Berkeley, Charleston, and Dorchester counties; and (2) the Orangeburg/Calhoun Service Area.[6] In the 2004–2005 State Health Plan, only the Tri–County Service Area consists of multiple counties.[7]

Finally, DHEC may not issue a CON unless an application complies with the State Health Plan, project review criteria, and other regulations. § 44–7–210(C); *see also* S.C.Code Ann. Regs. 61–15 § 801.3 (2011) (amended 2012) ("[N]o project may be approved unless it is consistent with the State Health Plan."); S.C.Code Ann. Regs. 61–15 § 802.1 ("The proposal shall not be approved unless it is in compliance with the State Health Plan.").

In the present case, Trident contends Roper's proposed hospital is not consistent with the 2008–2009 State Health Plan because it does not comply with the plain language of the Bed Transfer Provision,[8] which states:

Changes in the delivery system due to health care reform have resulted in the consolidation of facilities and the establishment of provider networks. These consolidations and agreements may lead to situations where affiliated hospitals may wish to transfer beds between themselves *in order to serve their patients in a more efficient manner.* A proposal to transfer or exchange hospital beds requires a [CON] and must comply with the following criteria:

---

6. *See* Chapter II.G.1 § A, 2008–2009 State Health Plan.

7. *See* Chapter II.G.1 § A, 2004–2005 State Health Plan.

8. It is undisputed that the Bed Transfer Provision is the only provision in the 2008–2009 State Health Plan that Roper may use to obtain a CON for a new hospital.

1. A transfer or exchange of beds may be approved only if there is no overall increase in the number of beds;

2. Such transfers may cross county lines; however, the applicants must document with patient origin data the historical utilization of the receiving facility by residents of the county giving up beds;

3. Should the response to Criterion 2 fail to show a historical precedence of residents of the county transferring the beds utilizing the receiving facility, the applicants must document why it is in the best interest of these residents to transfer the beds to a facility with no historical affinity for them;

4. The applicants must explain the impact of transferring the beds on the health care delivery system of the county from which the beds are to be taken; any negative impacts must be detailed along with the perceived benefits of such an agreement;

5. The facility receiving the beds must demonstrate the need for the additional capacity based on both historical and projected utilization patterns;

6. The facility giving up the beds may not use the loss of these beds as justification for a subsequent request for the approval of additional beds;

7. A written contract or agreement between the governing bodies of the affected facilities approving the transfer or exchange of beds must be included in the [CON] application;

8. Each facility giving up beds must acknowledge in writing that this exchange is permanent; any further transfers would be subject to this same process.

Chapter II.G.1 § (A)(4)(j), 2008–2009 State Health Plan (emphasis added). Trident argues this language allows DHEC to issue a CON for the transfer of beds between hospitals only when both hospitals already exist.

### DHEC's Interpretation

■ In 2009, the Board specifically addressed the Bed Transfer Provision in the 2004–2005 State Health Plan, which is identical to the Bed Transfer Provision in the 2008–2009 State Health Plan. The interpretation of the Bed Transfer

Provision was an issue in a contested case pending before the ALC, i.e., *Lexington County Health Services District, Inc. v. South Carolina Department of Health & Environmental Control,* Docket No. 07–ALJ–07–0520–CC. During the pendency of this contested case, the ALC remanded the question of whether the Bed Transfer Provision "allows the approval of a CON application for the transfer of ... hospital beds for the purpose of establishing a new hospital facility." The Board concluded:

Read as a whole, the General Hospital section of the [State Health Plan] recognizes that changes in the health care delivery system may call for the transfer of unused beds at one facility to a new facility constructed to receive them. Accordingly, the Board has determined that the *2004–2005 South Carolina Health Plan,* which includes the [Bed] Transfer Standard, allows for approval of a CON application for the transfer of licensed general acute care hospital beds to establish a new hospital.

The Board noted that DHEC's staff had properly interpreted and applied the 2004–2005 State Health Plan in approving the transfer of seventy-six acute care hospital beds from Palmetto Health Baptist Hospital in downtown Columbia to create Palmetto Health Baptist Parkridge, which was to be built in northwest Richland County.[9]

### Deference to DHEC's Interpretation

Our supreme court has recently expounded on the application of statutes and regulations administered by an administrative agency. In *Kiawah Development Partners, II v. South Carolina Department of Health & Environmental Control,* the court stated:

Interpreting and applying statutes and regulations administered by an agency is a two-step process. First, a court must determine whether the language of a statute or regulation directly speaks to the issue. If so, the court must

---

9. Although there is no conflict between the Board's interpretation of the Bed Transfer Provision and the staff's interpretation, we note that when such a conflict exists, "an agency's Appellate Panel [ (here, the Board) ], not its staff, is typically entitled to deference in interpreting agency regulations." *Neal v. Brown,* 383 S.C. 619, 624, 682 S.E.2d 268, 270 (2009).

utilize the clear meaning of the statute or regulation. If the statute or regulation is silent or ambiguous with respect to the specific issue, the court then must give deference to the agency's interpretation of the statute or regulation, assuming the interpretation is worthy of deference.

411 S.C. 16, 766 S.E.2d 707 (2014) (citations and internal quotation marks omitted).

The court further stated, "We defer to an agency interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* at 34–35, 766 S.E.2d at 718 (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).[10] After tracing the history of South Carolina's deference doctrine, the court concluded, "[W]e give deference to agencies both because they have been entrusted with administering their statutes and regulations and because they have unique skill and expertise in administering those statutes and regulations." *Id.* at 34, 766 S.E.2d at 718.

---

10. *See also Murphy v. S.C. Dep't of Health & Envtl. Control,* 396 S.C. 633, 640, 723 S.E.2d 191, 195 (2012) ("[W]e give deference to the interpretation of a regulation by the agency charged with it[s] enforcement." (citation omitted)); *S.C. Dep't of Revenue v. Anonymous Co. A,* 401 S.C. 513, 516, 678 S.E.2d 255, 257 (2009) (" 'The construction of a statute by an agency charged with its administration is entitled to the most respectful consideration and should not be overruled absent compelling reasons.'" (quoting *Sloan v. S.C. Bd. of Physical Therapy Exam'rs,* 370 S.C. 452, 469, 636 S.E.2d 598, 607 (2006))); *S.C. Coastal Conservation League v. S.C. Dep't of Health & Envtl. Control,* 363 S.C. 67, 75, 610 S.E.2d 482, 486 (2005) ("Courts defer to the relevant administrative agency's decisions with respect to its own regulations unless there is a *compelling* reason to differ." (emphasis added) (citations omitted)); *Spruill v. Richland Cnty. Sch. Dist. 2,* 363 S.C. 61, 65, 609 S.E.2d 524, 526 (2005) (stating that an agency's construction of its own regulation "is accorded most respectful consideration and will not be overturned absent *compelling* reasons." (emphasis added) (citation and internal quotation marks omitted)); *Dorman v. S.C. Dep't of Health & Envtl. Control,* 350 S.C. 159, 167, 565 S.E.2d 119, 123 (Ct.App.2002) ("[T]he construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons." (citation and internal quotation marks omitted)); *Converse Power Corp. v. S.C. Dep't of Health & Envtl. Control,* 350 S.C. 39, 48, 564 S.E.2d 341, 346 (Ct.App.2002) ("The construction of a regulation by the agency charged with executing the regulations is entitled to the most respectful consideration and should not be overruled without cogent reasons." (citation omitted)).

■ In the present case, as we evaluate the deference given by the ALC to DHEC's interpretation of the Bed Transfer Provision, we must be mindful of the General Assembly's entrustment of South Carolina's health care marketplace to DHEC for cost containment, prevention of unnecessary duplication, serving public needs, and ensuring the high quality of healthcare services. *See* § 44–7–120 (stating the purpose of the CON Act). DHEC plays a significant role in the drafting and approval of the State Health Plan, as it does in promulgating regulations. Therefore, we may interpret the State Health Plan using the rules of statutory construction applied to regulations,[11] with one caveat: "[E]ach *section* of the [State Health Plan] must be read as a whole." Chapter I.I, 2008–2009 State Health Plan (emphasis added).

In *Murphy v. South Carolina Department of Health & Environmental Control,* our supreme court was presented with DHEC's interpretation of its regulation concerning state water quality certifications.[12] 396 S.C. at 636–38, 723 S.E.2d at 192–94. In particular, the court examined the following language in Regulation 61–101: " 'Certification will be denied if (a) the proposed activity permanently alters the aquatic ecosystem in the vicinity of the project such that its functions and values are eliminated or impaired.' " *Id.* at 640, 723 S.E.2d at 195 (footnote omitted) (quoting S.C.Code Ann. Regs. 61–101.F.5(a) (Supp.2011)). DHEC interpreted the term "vicinity," which was not defined in the regulation, to include more than the immediate project area. *Id.* DHEC's project manager for the proposed project testified that DHEC "interpreted the 'vicinity of the project' on a case by case basis according to its best professional judgment as each project is different." *Id.* The court concluded, "Because this interpretation is both reasonable and consistent with the plain language of the regulation, we see no reason to deviate from DHEC's construction and application." *Id.* at 640–41, 723 S.E.2d at 195.

---

**11.** *Murphy,* 396 S.C. at 639, 723 S.E.2d at 195 (holding that regulations are interpreted using the rules of statutory construction).

**12.** A state water quality certification is required before the Army Corps of Engineers may issue a permit to fill portions of "waters of the United States" pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344.

Likewise, in the present case, DHEC's interpretation of the Bed Transfer Provision is not only reasonable but also consistent with the Bed Transfer Provision's plain language. The following language from the preamble to the Bed Transfer Provision indicates a purpose of building flexibility into the State Health Plan when dealing with provider networks:

> Changes in the delivery system due to health care reform have resulted in the consolidation of facilities and the establishment of provider networks. These consolidations and agreements may lead to situations where affiliated hospitals may wish to transfer beds between themselves *in order to serve their patients in a more efficient manner.*

(emphasis added).

We note Trident argues that Roper's Charleston facility and its proposed new hospital in Goose Creek are not "affiliated hospitals" because the definition of "affiliated hospitals" in Chapter II.B of the 2008–2009 State Health Plan excludes two facilities whose relationship has been established for the purpose of transferring beds. However, the record shows that Roper is not attempting to establish a relationship with a legally separate entity that has its own network of existing hospitals. Rather, Roper seeks to expand its own network of hospitals with the intent to provide convenience for its existing patients residing in Berkeley County, who now travel to Roper's facility in downtown Charleston.[13] The new hospital will be a continuation of an existing network of acute care facilities serving Roper patients in the Tri–County service area, i.e., Roper Hospital in downtown Charleston, Bon Secours St. Francis in Charleston County, Roper St. Francis Mount Pleasant Hospital, and a freestanding Emergency Department and Ambulatory Surgery Facility in Berkeley County.

The remainder of the Bed Transfer Provision consists of a list of eight criteria with which a CON applicant must comply. *See supra.* The language in this list certainly *accommodates* those CON applications for the transfer of beds to a receiving

---

13. The ALC found that twenty-three percent of those Berkeley County residents who were admitted to a hospital traveled past Trident Medical Center to seek care at Roper's facilities in downtown Charleston and west of the Ashley River.

facility already in existence at the time the application is submitted. Yet, there is no language in this list that either expressly or impliedly *requires* the receiving facility to be in existence when the CON application is submitted. Therefore, the plain language of the Bed Transfer Provision can be reasonably interpreted to include a receiving facility that will be constructed after DHEC issues the CON.

In any event, the Bed Transfer Provision is not a section unto itself—it is part of Chapter II.G.1 § (A) ("General Hospitals").[14] Therefore, we may not consider the language of the Bed Transfer Provision in isolation. Rather, Chapter I.I of the 2008–2009 State Health Plan states, "The criteria and standards set forth in the [State Health Plan] speak for themselves, and each *section* of the [State Health Plan] must be read *as a whole*." (emphases added). *Cf. Sparks v. Palmetto Hardwood, Inc.*, 406 S.C. 124, 128, 750 S.E.2d 61, 63 (2013) ("A statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers," and "the language of the statute must be read in a sense that harmonizes with its subject matter and accords with its general purpose." (citation and internal quotation marks omitted)); *id.* at 128–29, 750 S.E.2d at 63 (holding that words in a statute must be construed in context and that the court "may not, in order to give effect to particular words, virtually destroy the meaning of the entire context; that is, give the particular words a significance which would be clearly repugnant to the statute, looked at as a whole, and destructive of its obvious intent" (citation and internal quotation marks omitted)).

Hence, we must examine all the provisions of Chapter II.G.1 § (A) ("General Hospitals") before determining whether there is a compelling reason to reject DHEC's interpretation of the Bed Transfer Provision. Section (A) includes provisions that

---

**14.** *See* Chapter I.H (indicating what constitutes a "section" in Chapter II by noting, "A general statement has been added to each *section* of Chapter II stating the project review criteria considered to be the most important in reviewing [CON] applications for each type of facility, service, and equipment.... In addition, a finding has been made in each *section* as to whether the benefits of improved accessibility to each such type of facility, service[,] and equipment may outweigh the adverse [e]ffects caused by the duplication of any existing facility, service[,] or equipment." (emphases added)).

describe how the bed capacity of a general hospital is determined, set forth an inventory of general hospitals in the state and an explanation of the inventory, explain how the need for beds in the respective service areas is calculated, list required services a general hospital must provide, set forth factors to be considered regarding modernization of facilities, and describe the relative importance of the project review criteria for general hospitals. Of particular interest is the discussion of the most important project review criteria for general hospitals. *See* Chapter II.G.1 § (A), 2008–2009 State Health Plan. Significant emphasis should be placed on these criteria in interpreting section (A) as a whole. These criteria are

a. Compliance with the Need Outlined in [the State Health Plan];

b. Community Need Documentation;

c. Distribution (Accessibility);

d. Acceptability;

e. Financial Feasibility;

f. Cost Containment; and

g. Adverse Effects on Other Facilities.

*Id.* These criteria are not listed in order of importance. Chapter I.H, 2008–2009 State Health Plan. In fact, "[t]he relative importance assigned to each specific criterion is established by [DHEC] depending upon the importance of the criterion applied to the specific project." S.C.Code Ann. Regs. 61–15 § 801.2. Further, "[a] project does not have to satisfy every criterion in order to be approved," provided the project is consistent with the applicable State Health Plan. S.C.Code Ann. Regs. 61–15 § 801.3.

The first listed criterion, "Compliance with the Need Outlined in [the State Health Plan]," refers to the need for, or surplus of, beds at each listed hospital in the respective service areas. Notably, items (d) and (e) of Chapter II.G.1 § (A)(4), 2008–2009 State Health Plan, contemplate circumstances in which population projections that are not considered in the State Health Plan demonstrate the need for beds in a service area.[15] These provisions demonstrate that the

---

15. *See* Chapter II.G.1 § (A)(4)(d), 2008–2009 State Health Plan ("The hospital requesting the addition must document the need for additional

published results of the calculations for each hospital and each service area are not the final determinant of need for a particular service area. Rather, flexibility is built into the requirements for general hospitals when determining need.

The second listed criterion, "Community Need Documentation," states that the proposed project should provide services that meet a documented need of the target population and current or projected utilization should justify the expansion or implementation of the proposed service. S.C.Code Ann. Regs. 61–15 § 802.2. The third listed criterion, "Distribution (Accessibility)," provides, in pertinent part, that the proposed service "should be located so that it may serve medically underserved areas" and "allow for the delivery of necessary support services in an acceptable period of time." S.C.Code Ann. Regs. 61–15 § 802.3.

The fourth listed criterion, "Acceptability," states that the proposed project and the applicant should have the support of "affected persons,"[16] including local providers and the target population. S.C.Code Ann. Regs. 61–15 § 802.4. The fifth listed criterion, "Financial Feasibility," requires the applicant to project the immediate and long-term financial feasibility of the proposed project. S.C.Code Ann. Regs. 61–15 § 802.15.

---

beds *beyond those indicated as needed by the methodology stated above,* based on historical and projected utilization, as well as projected population growth or other factors demonstrating the need for the proposed beds." (emphasis added)); *id.* at (4)(e) ("An applicant requesting additional beds beyond those indicated as needed by the methodology stated above[ ] must document the need for additional beds based on historical and projected utilization, floor plan layouts, *projected population growth that has not been considered in this Plan* [,] or other factors demonstrating the need for the proposed beds." (emphasis added)).

**16.** "Affected person" means

the applicant, a person residing within the geographic area served or to be served by the applicant, persons located in the health service area in which the project is to be located and who provide similar services to the proposed project, persons who before receipt by [DHEC] of the proposal being reviewed have formally indicated an intention to provide similar services in the future, persons who pay for health services in the health service area in which the project is to be located and who have notified [DHEC] in writing of their interest in [CON] applications, the State Consumer Advocate and the State Ombudsman.

S.C.Code Ann. Regs. 61–15 § 103.1 (2011) (amended 2012).

The sixth listed criterion, "Cost Containment," requires the applicant to demonstrate that its chosen funding method is the most feasible option and the project's impact on the applicant's cost to provide services is reasonable. S.C.Code Ann. Regs. 61–15 § 802.16. Finally, the seventh listed criterion, "Adverse Effects on Other Facilities," states, "The impact on the current and projected occupancy rates or use rates of existing facilities and services should be weighed against the increased accessibility offered by the proposed services." S.C.Code Ann. Regs. 61–15 § 802.23. This criterion also provides that the staffing of the proposed service should not unnecessarily deplete the staff of existing facilities or cause an excessive rise in staffing costs. *Id.*

All of these criteria undoubtedly afford DHEC broad discretion in bringing its expertise in health care planning to the evaluation of CON applications for general hospitals. In turn, the incorporation of these criteria into the section in which the Bed Transfer Provision is located, Chapter II.G.1 § (A), signifies the intent of the State Health Planning Committee to provide flexibility in the application of section (A) to each proposed project with its own unique circumstances. Thus, it is reasonable for DHEC to interpret the Bed Transfer Provision as allowing the transfer of beds to a hospital that has not yet been built when the transfer would improve health care access for the target population. This is consistent with the plain language of the Bed Transfer Provision as well as the General Assembly's stated purpose for the CON Act: "[T]o promote cost containment, prevent unnecessary duplication of health care facilities and services, guide the establishment of health facilities and services [that] *will best serve public needs,* and ensure that high quality services are provided in health facilities in this State." § 44–7–120 (emphasis added).

 Just as the *Murphy* court found DHEC's flexible interpretation of its water quality certification regulation reasonable and consistent with the regulation's plain language,[17] we find DHEC's interpretation of the Bed Transfer Provision in the 2008–2009 State Health Plan reasonable and consistent with the plain language of that provision. Therefore, we find no compelling reason to reject DHEC's interpretation of the

17. 396 S.C. at 640–41, 723 S.E.2d at 195.

Bed Transfer Provision within section (A). *See S.C. Coastal Conservation League*, 363 S.C. at 75, 610 S.E.2d at 486 ("Courts defer to the relevant administrative agency's decisions with respect to its own regulations unless there is a compelling reason to differ."); *Spruill*, 363 S.C. at 65, 609 S.E.2d at 526 (holding courts traditionally defer to an executive agency's construction of its own regulation and this "construction is accorded most respectful consideration and will not be overturned absent compelling reasons" (citation and internal quotation marks omitted)).

Based on the foregoing, the ALC properly deferred to DHEC's interpretation of the Bed Transfer Provision.

## II. Competing Applicants

▪ Trident assigns error to the ALC's finding that Trident and Roper were not "competing applicants." Trident argues that as a matter of law, the approval of both CON applications would exceed the need for hospital beds in the area, and, therefore, DHEC was required to determine which applicant most fully complied with the CON Act, the State Health Plan, project review criteria, and applicable DHEC regulations. We disagree.

Section 44–7–130(5) defines "competing applicants" as

two or more persons or health care facilities as defined in this article who apply for [CONs] to provide similar services or facilities in the same service area within a time frame as established by departmental regulations and *whose applications, if approved, would exceed the need for services or facilities.*

(emphasis added).[18] When DHEC is faced with competing applications, it is required to award a CON, "if appropriate,"

---

18. Similarly, Regulation 61–15 defines "competing applicants" as

two or more persons and/or health care facilities as defined in this regulation who apply for [CONs] to provide similar services and/or facilities in the same service area and *whose applications[,] if approved[,] would exceed the need for this facility or service.* An application shall be considered competing if it is received by [DHEC] no later than fifteen (15) days after a Notice of Affected Persons is published in the State Register for one or more applications for similar services and/or facilities in the same service area.

S.C.Code Ann. Regs. 61–15 § 103.6 (emphasis added).

based on which, if any, application most fully complies with the CON Act, the State Health Plan, the project review criteria, and applicable DHEC regulations. § 44–7–210(C).

Here, the parties agree that (1) both Trident and Roper propose to provide similar services and facilities in the same service area; and (2) Trident's and Roper's respective CON applications were filed within the appropriate time frame for competing applications. However, Trident challenges the ALC's finding that the approval of both applications would not exceed the need for hospital facilities in the service area. Roper, on the other hand, argues substantial evidence supports the ALC's finding.

Nevertheless, Trident characterizes this issue as an issue of law, asserting that the question of whether both projects would exceed the need for hospital beds in the service area is determined solely by the indication of need set forth in the 2008–2009 State Health Plan's hospital inventory, which reflects an excess of forty-eight hospital beds for the Tri–County Service Area and an excess of six beds in Roper's inventory. Trident concludes that Roper's proposed hospital, "by itself or in conjunction with Trident's proposed hospital exceeds the need for hospital beds in the service area." We disagree. Section 44–7–130(5) clearly focuses on whether the proposed projects would *cause* an excess of services or facilities for the service area.

We agree with Trident that this issue is one of law but only because, in this case, we need not look to indicators of need outside of the 2008–2009 State Health Plan—the approval of both CONs will not exceed the need already documented in the 2008–2009 State Health Plan.[19] Roper is not seeking to add new beds to the service area. On the contrary, the existing hospital beds at Roper's facility in downtown Charleston were already approved for a CON. Thus, Roper is merely seeking to

---

19. At oral argument, Roper asserted the supreme court's opinion in *Spartanburg Reg'l*, 387 S.C. at 90–91, 690 S.E.2d at 789, established that the determination of "competing applicants" is always a factual determination. We do not read the *Spartanburg Reg'l* opinion that broadly. The determination *in that case* was factual. However, in this case, we need not go beyond the methodology set forth in the 2008–2009 State Health Plan to determine that Trident and Roper are not competing applicants.

transfer beds that are already available for use in the service area to a location in the very same service area that will be more convenient for its existing patients residing in Berkeley County, who now travel to Roper's facility in downtown Charleston.

Further, Trident's proposed addition of beds to the service area is filling a need already documented in the State Health Plan's hospital inventory. Moreover, the number of beds added by Trident that will exceed the number designated in the hospital inventory are allowed under the Fifty Bed Rule. *See supra.*

Based on the foregoing, the ALC correctly determined that Trident and Roper are not "competing applicants."

## CONCLUSION

Accordingly, the ALC's decision is

**AFFIRMED.**

WILLIAMS and McDONALD, JJ., concur.