723 S.E.2d 191

**Kim MURPHY, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL and District 5 of Lexington and Richland Counties, Respondents.**

No. 27099.

Supreme Court of South Carolina.

Heard Jan. 11, 2012.

Filed March 7, 2012.

634

Katie Renee Parham, The Parham Law Firm, of Irmo, and Robert Guild, of Columbia, for Appellant.

M. Elizabeth Crum & Pamela A. Baker of McNair Law Firm, of Columbia, and Stephen P. Hightower and Roger P. Hall, of Columbia, for Respondents.

Amy E. Armstrong and Michael G. Corley, of Pawleys Island, for Amicus Curiae, South Carolina Wildlife Federation.

James B. Richardson, Jr., of Columbia, for Amicus Curiae, Mining Association of South Carolina.

Justice HEARN.

This case centers on proposed renovations to the overcrowded Chapin High School, which require filling in a portion of a stream on the property. District 5 of Lexington and Richland Counties received a Section 401 water quality certification (WQC) from the Department of Health and Environmental Control (DHEC), authorizing the project and allowing the District to fill the approved portion of the stream. The Administrative Law Court (ALC) affirmed the certification, and Kim Murphy appeals, arguing the ALC erred in determining that the vicinity of the project included the area surrounding the proposed fill, failing to find that the project would damage the surrounding ecosystem, and finding no feasible alternatives to the proposed project. She also alleges DHEC impermissibly abdicated its decision-making authority to the District. We find no error in the ALC's analysis or in DHEC's evaluation of the project and accordingly affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Chapin High School, which is located in District 5 of Richland and Lexington Counties, was built in 1971 and designed to accommodate 600 pupils. Over the years, the surrounding areas have swelled in population, causing the number of students to far exceed the original building's capacity, with enrollment for the 2009–10 school year reaching approximately 1,350 students. To accommodate this growth of the student body, the District proposed an expansion of the school which would increase its capacity to 1,700 students. Because the District already owned adjacent property, it sought to undertake this expansion using that land. The proposed expansion included increasing the number of practice fields and parking lots, making improvements to the wastewater collection system, and installing stormwater controls, all of which would necessitate the filling of a portion of a stream located upon the property. This stream is part of an unnamed tributary that flows into Wateree Creek.

Because the stream was classified by the Army Corps of Engineers as waters of the United States, the District was

required to obtain a WQC [1] from DHEC, which is a prerequisite to obtaining a 404 Discharge Permit [2] from the Corps. Section 61–101 governs the issuance of the WQC and requires that DHEC deny certification if, *inter alia,* the "proposed activity permanently alters the aquatic ecosystem in the vicinity of the project such that its functions and values are eliminated or impaired" or "there is a feasible alternative to the activity" with less adverse consequences. 25A S.C.Code. Ann. Regs. 61–101.F.5(a) & (b) (Supp.2011). Over the next few months, DHEC and the Corps periodically requested additional information and modifications from the District. During this time, the District engaged in further studies of alternatives, and it eventually reduced the length of the stream it sought to fill from 1,501 feet to 727 feet by eliminating a practice field and reducing the number of parking spaces created for students. The District's plan also included implementing stormwater controls to improve the quality of water as it flowed downstream.[3]

About eight months after the District applied for the WQC, DHEC issued a staff assessment recommending that the District be issued the certification. Kim Murphy, who lives near Wateree Creek and was at the time the mother of two Chapin High School students and one Chapin High School graduate, sought review of this assessment before the Board of Health and Environmental Control. The Board declined review, and the staff assessment became DHEC's final deci-

---

1. Section 401 of the Clean Water Act, 33 USC § 1341, provides that to obtain a Federal permit for discharge, an applicant must first obtain a certification from the applicable state agency that the discharge complies with sections 1311, 1312, 1316, and 1317 of the Act. To comply with this mandate, South Carolina enacted Regulation 61–101 to establish the certification requirements.

2. An entity that intends to fill a portion of waters of the United States must obtain a permit prior to the filling pursuant to section 404 of the Clean Water Act. The permit, also known as a 404 Discharge Permit, is issued by the Corps based upon an evaluation under the Guidelines for Specification of Disposal Sites for Dredged or Filled Material, which are codified at 40 C.F.R. § 230 (2011) and commonly referred to as the 404(b)(1) Guidelines.

3. Because Chapin High School was built prior to the enactment of any state and local requirements for stormwater discharge, there are no stormwater controls on the school site.

sion. DHEC then advised the Corps that it had issued the WQC, and the Corps, upon completing its review of the District's application, issued the Discharge Permit.[4]

Murphy requested a contested case hearing before the ALC arguing that DHEC had erred in applying Regulation 61–101 by concluding that the proposed fill would not detrimentally alter the aquatic ecosystem in the vicinity of the project, that there were no feasible alternatives with less adverse impacts, and that the project as proposed sufficiently minimized the impact to the ecosystem. In support of her argument, Murphy presented expert testimony on the existence of feasible alternatives and the negative impact that would result to the ecosystem if this fill took place. She also questioned the independence of DHEC's review due to its concurrence with many of the findings of the District's engineers and its acceptance of the District's claimed needs. DHEC and the District (collectively, Respondents) submitted evidence supporting the minimized impact of the proposed plan and demonstrating why the particular plan was chosen over other alternatives.

The ALC specifically rejected Murphy's claim that in considering the "vicinity of the project" under Regulation 61–101, DHEC's inquiry should have been limited to the 727 feet of stream the District proposed to fill. Accordingly, it found that the functions and values of the stream in the vicinity would not be eliminated or impaired by the fill. Additionally, in determining whether feasible alternatives to the project existed, the ALC used the 404(b)(1) Guidelines' word "practicableness" as an equivalent to the undefined word "feasible." Under the Guidelines, an alternative is practicable if "it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Applying this definition, the ALC concluded that there were no feasible alternatives. The ALC therefore affirmed the certification and this appeal followed.

## ISSUES PRESENTED

I. Did the ALC err in its construction of Regulation 61–101?

---

4. The issuance of this permit has not been challenged.

II. Did the ALC err in finding that there are no feasible alternatives to the project and in its use of the 404(b)(1) Guidelines found in 40 C.F.R. § 230?

III. Did DHEC improperly delegate its decision-making authority to District 5?

## STANDARD OF REVIEW

 The Administrative Procedures Act establishes the standard of review this Court applies to appeals from the ALC. Section 1–23–610(D) of the South Carolina Code (2010) provides that the Court may reverse or modify the ALC's decision only if the substantive rights of a party have been prejudiced due to constitutional or statutory violations; an agency exceeding its authority; unlawful procedure; an error of law; a clearly erroneous view of evidence in the record; or an abuse of discretion. "As to factual issues, judicial review of administrative agency orders is limited to a determination [of] whether the order is supported by substantial evidence." *MRI at Belfair, LLC v. S.C. Dept. of Health & Envtl. Control,* 379 S.C. 1, 6, 664 S.E.2d 471, 474 (2008). When finding substantial evidence to support the ALC's decision, the Court need only determine that, based on the record as a whole, reasonable minds could reach the same conclusion. *Hill v. S.C. Dept. of Health & Envtl. Control,* 389 S.C. 1, 9–10, 698 S.E.2d 612, 617 (2010).

## LAW/ANALYSIS

### I. REGULATION 61–101

Murphy first contends that the ALC erred in both its construction of Regulation 61–101 and in its application.

### A. Interpretation of the Regulation

Murphy argues that the ALC erred in interpreting the use of the word "vicinity" to include more than the project area of 727 feet of stream. We disagree.

 Regulations are interpreted using the same rules of construction as statutes. *See S.C. Ambulatory Surgery Ctr. Ass'n v. S.C. Workers' Comp. Comm'n,* 389 S.C. 380, 389, 699 S.E.2d 146, 151 (2010) "When interpreting a regulation, we

look for the plain and ordinary meaning of the words of the regulation, without resort to subtle or forced construction to limit or expand the regulation's operation." *Converse Power Corp. v. S.C. Dept. of Health & Envt. Control*, 350 S.C. 39, 47, 564 S.E.2d 341, 346 (Ct.App.2002).

 Regulation 61–101 states, "Certification will be denied if (a) the proposed activity permanently alters the aquatic ecosystem in the vicinity of the project such that its functions and values [5] are eliminated or impaired." 25A S.C.Code Ann. Regs. 61–101.F.5(a) (Supp.2011). Although vicinity is not defined in the regulations, we interpret an undefined term in accordance with its usual and customary meaning. *Branch v. City of Myrtle Beach*, 340 S.C. 405, 409–10, 532 S.E.2d 289, 292 (2000). Merriam–Webster defines vicinity as meaning "the quality or state of being near: proximity" or "a surrounding area or district: neighborhood." Merriam–Webster Dictionary, http://www.merriam-webster.com/dictionary/vicinity. Using this accepted meaning of the word vicinity, the regulation clearly includes more than just the project; it logically incorporates the surrounding area. Moreover, a reading to the contrary would render it impossible to ever obtain a certification to fill a portion of a stream as the functions and values of that area would always necessarily be eliminated.

 Furthermore, we give deference to the interpretation of a regulation by the agency charged with it enforcement. *See Brown v. Bi–Lo, Inc.*, 354 S.C. 436, 440, 581 S.E.2d 836, 838 (2003). During her testimony, Jennifer Haynes, who had been the DHEC project manager for the Chapin High School WQC, clarified that DHEC interpreted the "vicinity of the project" on a case by case basis according to its best professional judgment as each project is different. Thus, Haynes testified that when applying Regulation 61–101, she "considered the vicinity [to include] more than just the 727 feet of stream" and noted that although she did not have an exact area, it included many miles. Because this interpretation is both reasonable and consistent with the plain language of the

---

**5.** "Functions and values" are terms of art. According to Murphy's expert in watershed ecology, Dr. Tufford, "functions" refers to the ecological processes occurring at a location while "values" refers to the benefits that humans derive from a natural system.

regulation, we see no reason to deviate from DHEC's construction and application.

## B. Application of Regulation 61–101

■ Additionally, Murphy argues that even evaluating an area greater than the 727 feet to be filled, the ALC erred in finding that the functions and values would not be impaired and thus certification was improper. We, however, find the ALC's decision supported by substantial evidence in the record.

Both experts for Murphy and for the District concluded that the quality of the stream as it currently exists is poor [6] and it lacks stormwater controls. The proposed project would include the use of detention ponds to manage the flow of stormwater which would actually improve the quality of the water in the stream.[7] The District also agreed to use a velocity attenuator which would slow the flow of the water from the stormwater trunk line thereby reducing the amount of sediment or other solids that reached the unnamed tributary and eventually Wateree Creek.

Furthermore, even though Dr. Tufford opined that filling the portion of the stream may have some impact on the functions and values of the Wateree Creek system, he acknowledged that ecosystems can adapt and that the nature and extent of the impact was difficult to determine without further study. While he also expressed some concern that the lower portions of the stream may dry up except during rain events, the District, in response, agreed to create a preferential pathway to maintain the flow of the water down to the lower portions of the stream.

---

6. Dr. Tufford performed a Stream Visual Assessment Protocol which determines the ecological integrity and status of streams. After dividing the stream into five segments, he analyzed each one separately and gave each section a rating of "poor," which indicated "that the functions and values within that [portion] of the stream are limited and impaired."

7. Dr. Tufford also admitted that the project's proposed stormwater treatment would have a beneficial effect on the water quality, acknowledging that any time there is a rain event, the stream currently carries pollutants, including parking lot runoff, chemicals for fertilizers, and fecal coliform.

Because the project will actually improve the flow and water quality of the stream and the evidence showing that the area downstream would be negatively impacted is tenuous, we find substantial evidence to support the ALC's conclusion that the functions and values in the vicinity of the project will not be impaired.[8]

## II. FEASIBLE ALTERNATIVES AND THE 404(B)(1) GUIDELINES

Murphy next challenges the ALC's determination that there were no feasible alternatives, both in terms of the evidence existing in the record and the burden of proof it applied.

### A. Substantial Evidence

■ Murphy's first argument is that the unrebutted testimony of her professional engineer, who identified a series of alternative site designs, demonstrated that feasible alternatives were available and certification should have been denied.[9] We disagree.

Under Regulation 61–101, certification should be denied if "there is a feasible alternative to the activity which reduces adverse consequences on water quality and classified uses." 25A S.C.Code. Ann. Regs. 61–101.F.5(b). Initially, Murphy asserts that because Respondents did not provide rebuttal testimony to her expert, Steve Strickland, the ALC erred in not accepting his conclusions that feasible alternatives to the site design existed. However, Respondents were not required to reply directly to Strickland's testimony because Strickland was himself a rebuttal witness retained after the commencement of the trial to rebut testimony of the District's engineer. Although Respondents could have called another witness in

---

8. We note as well that although the South Carolina Department of Natural Resources and the United States Fish and Wildlife Service initially requested the project be held in abeyance because of concerns about impacts to the stream, both agencies later submitted letters stating they had no objection to the project.

9. Murphy appears to misconstrue our standard of review, couching it in terms of whether substantial evidence supports *her* assertion. The question before us, however, is whether the ALC's finding that no feasible alternatives exist is supported by substantial evidence such that a reasonable person would reach the same conclusion as the ALC.

counter-rebuttal, the failure to do so does not, as Murphy contends, amount to a concession that Strickland's designs offered feasible alternatives. Instead, Respondents may have concluded it was unnecessary to respond to Stickland's challenges.

Given that the term "feasible alternative" is not defined within the regulations, the ALC concluded that " 'feasible' is equivalent to 'practicableness,' "[10] a term utilized by the Corps of Engineers which means "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purpose." 40 C.F.R. § 230.10(a)(2). Applying the "practicableness" meaning to the facts, we find substantial evidence to support the ALC's conclusion that no "feasible alternatives" existed with less adverse results.

During the certification process, District 5 was required to evaluate and report on alternatives which would cause the least negative impact to the stream. This included considerations of moving the practice fields offsite, purchasing adjacent property, obtaining an encroachment onto Santee Cooper's right of way, and shifting the parking lots and access roads. The District eventually reduced its requested fill area to 727 feet from the 1,501 feet it originally requested. The District also had to comply with the Office of Student Facilities' requirement that student parking be visible to the administration, so there were only limited areas where the parking lots could be placed. Other options, such as purchasing adjacent property, were deemed too expensive. Furthermore, offsite options would result in a disjointed campus, which would not properly serve the overall purpose of the project and could be detrimental to the paramount concerns for student safety and security.

Although Strickland opined that there were several alternatives the District could employ, the ALC found problems with all of them. His proposals to move the parking lot off the stream involved the construction of an expensive pedestrian bridge and required a decrease in the number of much needed parking spaces. He also proposed the use of expensive alternatives such as wetlands or underground retention as opposed

---

10. This ruling has not been challenged.

to detention pools to deal with stormwater management. Moreover, the ALC noted that Strickland had spent only 40–60 hours considering these alternative designs and had visited the site only once for two hours. The ALC also found that he had not had an opportunity to review the stormwater plans, drainage calculations, or the findings regarding the parking needs of the District.

Given the careful study of alternatives by DHEC and the District, and the ALC's thorough consideration of Murphy's expert testimony, we find substantial evidence to support the ALC's conclusion that no feasible alternatives existed.

## B. Burden of Proof

Murphy also argues that because the ALC relied on the 404(b)(1) Guidelines of 40 C.F.R. § 230 in concluding "as a matter of law, that the meaning of 'feasible' is equivalent to 'practicableness,'" the ALC should have also, in accordance with the Guidelines, presumed that practicable alternatives were available. We disagree.

Murphy rests this contention on the language of the regulation which states:

Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.

40 C.F.R. § 230.10(a)(3). Murphy contends that because the ALC borrowed the defined word "practicableness" to clarify the vague word "feasible," the ALC should also have adopted the entire analysis of practicable alternatives employed by the section 404(B)(1) Guidelines. She contends that because the proposed project is not "water dependent" a presumption should arise against the District that less adverse alternatives

exist and the ALC erred in shifting the burden to Murphy to demonstrate the availability of feasible alternatives.

We find Murphy's attempt to adopt the language of an entire regulation based on the ALC's use of a definition is misguided. The ALC used the definition of practicableness to clarify one of DHEC's statutes and aid in its evaluation of whether there were feasible alternatives under Regulation 61–101. The language Murphy attempts to import from the federal guidelines deals with whether the Corps of Engineers will issue a fill permit, which is a distinct consideration the Corps undertakes. The mere use of a definition for one word from the Guidelines does not require the ALC to structure its whole analysis on the language of that regulation.

Moreover, even assuming the District bore a burden to overcome the presumption that practicable alternatives exist, substantial evidence supports the conclusion that this burden was overcome. As discussed previously, the District engaged in extensive studies of alternatives and altered the original plan to reduce the impact to the stream when possible. Additionally, although the analysis of the Corps is not dispositive, because the Corps eventually issued the fill permit, it apparently concluded that the District had overcome these presumptions and established no practicable alternatives existed.

### III. IMPROPER DELEGATION OF AUTHORITY

 Finally, Murphy argues that DHEC improperly delegated its authority to grant the WQC to the District by accepting its assessment of need and the conclusions of its engineers. We disagree.

In determining whether to issue a WQC, DHEC is required to consider:

(a) whether the activity is water dependent and the intended purpose of the activity;

(b) whether there are feasible alternatives to the activity;

(c) all potential water quality impacts of the project, both direct and indirect, over the life of the project including:

(1) impact on existing and classified water uses;

(2) physical, chemical, and biological impacts, including cumulative impacts;

(3) the effect on circulation patterns and water movement;

(4) the cumulative impacts of the proposed activity and reasonably foreseeable similar activities of the applicant and others.

25A S.C.Code Ann. Regs. 61–101.F.3.

In its staff assessment, DHEC addressed these concerns in some detail, and the supporting documents within the record provide a more in-depth review. Although DHEC may have relied on the information submitted by the District's experts, it certainly was at liberty so to do. The mere fact that DHEC agreed with the findings of the District does not indicate it allowed its authority to be supplanted. Furthermore, contrary to Murphy's assertions, DHEC did not merely accept the information submitted by the District without question. The record contains several communications between the District and DHEC in which DHEC repeatedly requests more information on certain issues, especially whether there are alternatives to the project and why such alternatives are not feasible. The record also shows that the District changed its original plan after these communications, eventually reducing the area of stream it sought to fill. It did so in part by eliminating a practice field and reducing the amount of student parking below its level of need. Thus, DHEC did not improperly delegate its authority to the District, but instead appears to have been extensively involved in reducing the impact of the project. It certainly did not merely adopt the conclusions of the District or its experts.

## CONCLUSION

Accordingly, we affirm the ALC's order upholding DHEC's issuance of a WQC to District 5.

AFFIRMED.

TOAL, C.J., PLEICONES, BEATTY and KITTREDGE, JJ., concur.