# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Charles S. Blackmon and South Carolinians for Responsible Agricultural Practices, Appellants,

v.

South Carolina Department of Health and Environmental Control, and David Coggins Broilers, Respondents,

Charles S. Blackmon and South Carolinians for Responsible Agricultural Practices, Appellants,

v.

South Carolina Department of Health and Environmental Control, and Heath Coggins Broilers, Respondents,

Charles S. Blackmon and South Carolinians for Responsible Agricultural Practices, Appellants,

v.

South Carolina Department of Health and Environmental Control, and Jim Young Broilers, Respondents.

Appellate Case No. 2017-002598

---

Appeal From The Administrative Law Court
Ralph King Anderson, III, Administrative Law Judge

---

Opinion No. 5911
Heard December 9, 2020 – Filed May 25, 2022

---

**REVERSED AND REMANDED**

Robert Guild, of Robert Guild, Attorney at Law, of Columbia, for Appellants.

Mitchell Willoughby and Tracey Colton Green, both of Willoughby & Hoefer, PA, of Columbia, for Respondents David Coggins Broilers, Heath Coggins Broilers, and Jim Young Broilers.

Michael Smoak Traynham, of Nexsen Pruet, LLC, of Columbia; and Sara Volk Martinez and Stephen Philip Hightower, both of the South Carolina Department of Health and Environmental Control, of Columbia; all for Respondent South Carolina Department of Health and Environmental Control.

**LOCKEMY, A.J.:** In this contested case, Charles S. Blackmon and South Carolinians for Responsible Agricultural Practices (collectively, Appellants) appeal the order of the Administrative Law Court (the ALC) affirming the South Carolina Department of Health and Environmental Control's (the Department's) issuance of agricultural permits to David Coggins Broilers, Heath Coggins Broilers, and Jim Young Broilers (collectively, Broilers). Appellants argue the ALC erred in (1) deferring to the Department's interpretation of regulations 61-9.122 and 61-43 Part 200 of the South Carolina Code[1] and concluding that, as a matter of law, Broilers were not required to apply for a separate National Pollutant Discharge Elimination System (NPDES) permit or obtain an exemption from the Department; (2) deferring to the Department's interpretation of regulation 61-43 that allowed it to avoid mandated aspects of permit evaluation and precluded a meaningful review of the permit application; and (3) requiring Appellants to establish actual discharges of pollutants by existing permittees. We reverse and remand to the Department.

---

[1] S.C. Code Ann. Regs. 61-9.122 to 61-9.125 (2011 & Supp. 2021) (implementing the National Pollutant Discharge Elimination System (NPDES) program); S.C. Code Ann. Regs. 61-43.200.10 to 200.200 (2011 & Supp. 2021) (setting forth the standards for permitting of agricultural facilities other than swine).

**FACTS AND PROCEDURAL HISTORY**

In 2016, Broilers each submitted an application to the Department for new agricultural animal facilities permits to construct and operate their proposed broiler facilities. Broilers collectively proposed to construct eighteen broiler houses on a 255-acre tract located in the Little River watershed in the Mountville area of Laurens County. David Coggins Broilers' facility proposed to house 162,000 broilers, and Heath Coggins Broilers and Jim Young Broilers each proposed to house 237,600 broilers in their respective facilities.

As part of the application process, public notices were sent to neighboring property owners notifying them of Broilers' intent to apply for agricultural permitting. At the request of several Mountville citizens, the Department held public meetings in September and October of 2016. Blackmon and several other property owners in the Mountville area, including Margaret Sparrow, Mary Basel, Kathy Lowman, and Eugene Ross Stewart, formed an unincorporated association called "South Carolinians for Responsible Agricultural Practices" to challenge Broilers' proposed facilities.

After reviewing the applications and completing "Agricultural Permitting Review Checklists," the Department issued Bureau of Water Agricultural Permits to all Broilers in November and December of 2016. Each permit provided for the operation of "no-discharge" facilities and contained a special condition that required Broilers to "[o]perate and maintain [a] waste management system in accordance with State and Federal law so as to prevent discharges to the environment." Public notices were circulated in a local publication after the Department issued the permits.

After the Department declined Appellants' requests to hold a final review conference as to Broilers' permits, Appellants filed a request for a contested case hearing with the ALC as to each permit.[2] The ALC granted the parties' request to consolidate the three cases for purposes of the contested case hearing.

Broilers moved for partial summary judgment, arguing they were not required to seek NPDES permits for the facilities because the agricultural permits the Department issued to them prohibited the discharge of pollutants into the waters of the state. Broilers asserted the Department was therefore not required to follow the

---

[2] Appellants challenged each of the permits on five grounds. The only ground raised on appeal concerns the discharge of pollutants into waters of the state.

procedure set forth in regulation 61-9.122.23(d)(2)[3] for determining whether the facilities had "no potential to discharge."

The ALC held a merits hearing. Appellants presented the testimony of several witnesses, including Dr. David Hargett, who testified as an expert in soil and water resource management; William Chaplin, an employee of the Department, who testified he reviewed Broilers' permit applications; and Christopher Mosley, a staff member of Agri-Waste Technology, Inc., who testified he prepared the Comprehensive Nutrient Management Plans (CNMPs) for each of the three applications. Mosley explained that in drafting each of the CNMPs, his team used soil maps, topographical maps, and satellite imagery, and conducted site visits. The CNMPs provided the number of broilers to be housed at the facilities, the amount of litter that would be produced, Broilers' plan for disposing of that litter, and the setback distances for the facilities.

The ALC accepted proposed orders from Appellants, Broilers, and the Department. The ALC granted partial summary judgment in favor of Broilers and the Department (collectively, Respondents), concluding an NPDES permit was not required and the Department was not required to determine whether the facilities had no potential to discharge.

Although the ALC found "the plain language of [regulation] 61-9.122.23 define[d]" Broilers as concentrated animal feeding operations (CAFOs), it concluded "the Department's application of [regulation] 61-43 part 200 in keeping with the regulation of CAFOs under the NPDES provisions [wa]s entitled to deference." Specifically, the ALC deferred to the Department's interpretation of regulations 61-43.200 and 61-9.122.23 that by issuing an agricultural permit pursuant to regulation 61-43.200, the Department also determined the facility had no potential to discharge into the waters of the state under regulation 61-9.122.23. The ALC reasoned that because permits issued pursuant to regulation 61-43.200 were "no-discharge" permits—and as such did not allow the facilities to discharge pollutants—there was an inherent determination the facilities had "no potential to discharge." *See* Regs. 61-43.200.20(B) ("Permits issued under this regulation are

---

[3] Regs. 61-9.122.23(d)(2) (providing "[a]n owner or operator of a Large [concentrated animal feeding operation (CAFO)] need not seek coverage under an NPDES permit otherwise required by this section once the owner or operator has received from the Department notification of a determination under paragraph (f) of this section that the CAFO has 'no potential to discharge' manure, litter, or process wastewater").

no-discharge permits.").  The ALC thus concluded the permits prohibited Broilers from discharging pollutants into waters of the state and because Broilers did not seek to discharge pollutants into waters of the state, they were not required to apply for or obtain an NPDES permit as a matter of law.  Additionally, the ALC opined, "Even if facts later reflect that [Broilers] are obligated to seek or obtain an NPDES permit because they are 'new source' CAFOs, that obligation would not occur until 'at least 180 days prior to the time that the CAFO[s] commence[d] operation'" and therefore, this issue was not ripe for consideration.  The ALC considered Appellants' remaining arguments and affirmed the Department's issuance of the permits.  The ALC found the Department complied with the regulatory requirements in reviewing and issuing the permits.  However, the ALC increased the setbacks of the facilities to move them farther from the Little River.[4]  Finally, the ALC added a condition to the permits that provided, "The Permits shall be conditioned upon each of the permittees obtaining a stormwater permit that addresses whether the setback limitation should exceed the minimum requirements."  This appeal followed.

**ISSUES ON APPEAL**

1.  Did the ALC err in deferring to the Department's interpretation of regulations 61-9 and 61-43 in concluding Broilers were not required either to obtain an NPDES permit or request a determination by the Department that their operations had "no potential to discharge"?

2.  Did the ALC err in deferring to the Department's interpretation of regulation 61-43 that allowed the Department to avoid mandated aspects of permit evaluation, thus precluding meaningful review of agricultural permit applications?

3.  Did the ALC err in imposing a burden upon Appellants to prove actual discharges of pollutants into waters of the state by existing agricultural permittees?

---

[4] To address the complaints Basel—one of the property owners—raised during the public comment period, Chaplin required David Coggins and Jim Young to move their proposed facilities farther from Basel's property, which would have resulted in the facilities being closer to the Little River.  The ALC's ruling reversed this accommodation and required the facilities to be moved back to their originally proposed location, farther from the Little River.

**STANDARD OF REVIEW**

This court may reverse a decision of the ALC "if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is . . . affected by [an] error of law . . . [or is] arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." S.C. Code Ann. § 1-23-610(B)(d),(f) (Supp. 2021). This court reviews questions of law de novo. *S.C. Dep't of Revenue v. Blue Moon of Newberry, Inc.*, 397 S.C. 256, 260, 725 S.E.2d 480, 483 (2012). "The construction of a regulation is a question of law . . . ." *Id.* (quoting 2 Am. Jur. 2d *Administrative Law* § 245). "[W]e will reject [an] agency's interpretation if it is contrary to the regulation's plain language." *Id.* at 261, 725 S.E.2d at 483.

**LAW AND ANALYSIS**

**I. NPDES Permits**

Regulation 61-9.122.1(b)(1) defines the scope of the NPDES permit requirement and provides it "requires permits for the discharge of 'pollutants' from any 'point source' into 'waters of the State.'" Regs. 61-9.122.1(b)(1). Paragraph (b)(4) provides that a "concentrated animal feeding operation [(CAFO)] as defined in section 122.23" is a "point source[]" that requires an NPDES permit "for discharges." Regs. 61-9.122.1(b)(4)(i). Regulation 61-9.122.23(a) provides CAFOs, as defined in regulation 61-9.122.23(b), are point sources "that require NPDES permits for discharges *or potential discharges*," and regulation 61-9.122.21(a)(1) states, "All [CAFOs] . . . have a duty to seek coverage under an NPDES permit, as described in section 122.23(d)." (emphasis added); *see also* Regs. 61-9.122.2(b) (stating a "[d]ischarge of a pollutant" means "[a]ny addition of any pollutant or combination of pollutants to waters of the State from any point source"); *id.* (providing a "point source" includes "any . . . [CAFO] from which pollutants are *or may be discharged*" (emphasis added)); *id.* ("'Point source discharge' means a discharge [that] is released to the waters of the State by a discernible, confined and discrete conveyance, including but not limited to a . . . [CAFO] . . . from which waste is or may be discharged.").

Paragraph (d) of this regulation states a CAFO owner or operator "must seek coverage under an NPDES permit" unless it has "received from the Department notification of a determination under paragraph (f)" that it "has 'no potential to discharge' manure, litter, or process wastewater." Regs. 61-9.122.23(d)(1)-(2).

Paragraph (f)(1) provides,

> The Department, *upon request*, may make *a case-specific determination* that a Large CAFO has "no potential to discharge" pollutants to waters of the State.  In making this determination, *the Department must consider the potential for discharges* from both the production area and any land application areas. . . .  For purposes of this section, the term "no potential to discharge" means that there is *no potential* for any CAFO manure, litter, or process wastewater to be added to waters of the State *under any circumstance or climatic condition*.  A determination that there is "no potential to discharge" for purposes of this section only relates to discharges of manure, litter, and process wastewater covered by this section.

Regs. 61-9.122.23(f)(1) (emphases added).

The CAFO owner or operator must seek coverage under an NPDES permit at least 180 days before commencing operations and must include the information specified in regulations 61-9.122.21(f) and 61-9.122.21(i)(1)(i) to (ix) with its request.  *See* Regs. 61-9.122.23(f)(2), (g)(4); Regs. 61-9.122.21(f),(i).  Regulation 61-9.122.21(f) requires basic information concerning the CAFO's geographical location, its contact information, its business activities, its principal products or services, and any permits or construction approvals it has received or for which it has applied.  Regulation 61-9.122.21(i)(1)(i) to (ix) requires that a CAFO provide the following in addition to basic contact information:

> (iii) Latitude and longitude of the production area (entrance to production area);

> (iv) A topographic map of the geographic area in which the CAFO is located showing the specific location of the production area . . . ;

> (v) Specific information about the number and type of animals, whether in open confinement or housed under roof . . . ;

(vi) The type of containment and storage . . . and total capacity for manure, litter, and process wastewater storage . . . ;

(vii) The total number of acres under control of the applicant available for land application of manure, litter, or process wastewater;

(viii) Estimated amounts of manure, litter, and process wastewater generated per year (tons/gallons); [and]

(ix) Estimated amounts of manure, litter, and process wastewater transferred to other persons per year (tons/gallons) . . . .

The NPDES permitting requirements also specify that a "'no potential to discharge' determination does not relieve the CAFO from the consequences of an actual discharge." Regs. 61-9.122.23(f)(5). Further, the Department retains the authority to subsequently require an NPDES permit if circumstances at the facility change. *See* Regs. 61-9.122.23(f)(6).

Part 200 of Regulation 61-43 governs the permitting of animal facilities. "Permits issued under this regulation are no-discharge permits." Regs. 61-43.200.20(B). In making permitting decisions, "The Department shall act on all permits to prevent, so far as reasonably possible considering relevant standards under state and federal laws, an increase in pollution of the waters and air of the [s]tate from any new or enlarged sources." Regs. 61-43.200.70(E).

Appellants contend the ALC erred by deferring to the Department's interpretation that its issuance of a "no-discharge" permit pursuant to part 200 of regulation 61-43 constituted "an inherent determination that the facilities ha[d] no 'potential to discharge'" in keeping with regulation 61-9.122.23(f). Appellants argue that because the plain language of regulations 61-9 and part 200 of 61-43 are contrary to the Department's interpretation, this court should reverse the ALC's decision. They assert that, by definition, large CAFOs have a potential to discharge and the Department's interpretation that Broilers were not large CAFOs was contrary to the plain language of regulation 61-9. In addition, Appellants argue the ALC erred by finding as an additional sustaining ground that the issue was not ripe for judicial determination. We agree.

"[O]ur deference doctrine provides that courts defer to an administrative agency's interpretations with respect to the statutes entrusted to its administration or its own regulations 'unless there is a compelling reason to differ.'" *Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control*, 411 S.C. 16, 34, 766 S.E.2d 707, 718 (2014) (quoting *S.C. Coastal Conservation League v. S.C. Dep't of Health & Envtl. Control*, 363 S.C. 67, 75, 610 S.E.2d 482, 486 (2005)). "We defer to an agency interpretation unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Id.* at 34-35, 766 S.E.2d at 718 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council Inc.*, 467 U.S. 837, 844 (1984)); *see also Murphy v. S.C. Dep't of Health & Envtl. Control*, 396 S.C. 633, 640-41, 723 S.E.2d 191, 195 (2012) (deferring to the Department's "construction and application" of a regulation when it was "both reasonable and consistent with the plain language of the regulation"). "A decision is arbitrary if it is without a rational basis, is based alone on one's will and not upon any course of reasoning and exercise of judgment, is made at pleasure, without adequate determining principles, or is governed by no fixed rules or standards." *Converse Power Corp. v. S.C. Dep't of Health & Envtl. Control*, 350 S.C. 39, 47, 564 S.E.2d 341, 345 (Ct. App. 2002) (quoting *Deese v. State Bd. of Dentistry*, 286 S.C. 182, 184-85, 332 S.E.2d 539, 541 (Ct. App. 1985)).

"Regulations are interpreted using the same rules of construction as statutes." *Murphy*, 396 S.C. at 639, 723 S.E.2d at 195. "When interpreting a regulation, we look for the plain and ordinary meaning of the words of the regulation, without resort to subtle or forced construction to limit or expand the regulation's operation." *Id.* at 639-40, 723 S.E.2d at 195 (quoting *Converse Power Corp.*, 350 S.C. at 47, 564 S.E.2d at 346)). "Whe[n] the language of a regulation is plain, unambiguous, and conveys a clear and definite meaning, interpretation of the regulation is unnecessary and improper." *Kiawah Dev. Partners, II*, 411 S.C. at 39, 766 S.E.2d at 720-21. "However, if applying the regulation's plain language would lead to an absurd result, we will interpret the regulation in a manner which avoids the absurdity." *Blue Moon of Newberry, Inc.*, 397 S.C. at 261, 725 S.E.2d at 483.

As an initial matter, we address Respondents' procedural arguments. We reject Respondents' assertions that Appellants failed to preserve the arguments they raise on appeal and that the issues are not ripe for judicial determination. As to preservation, Appellants advanced their arguments to the ALC that Broilers were required to either seek an NPDES permit or obtain an exception from the Department and that the Department improperly interpreted its regulations and failed to conduct a site-specific evaluation to determine whether Broilers had a potential to discharge and thus contribute to the pollution of waters of the state.

The ALC ruled on these issues. We therefore conclude Appellants' arguments are preserved for our review. *Herron v. Century BMW*, 395 S.C. 461, 465, 719 S.E.2d 640, 642 (2011) ("[I]ssue preservation requires that an issue be raised to and ruled upon by the trial judge."). As to ripeness, the regulations require CAFOs to apply for an NPDES permit at least 180 days before the CAFO begins operation; however, nothing prevents a party from applying sooner. *See* Regs. 61-9.122.23(g). Further, Respondents contend Broilers were not required to apply for such permit, regardless of timing. Thus, we find the issue is ripe for judicial determination. *See Waters v. S.C. Land Res. Conservation Comm'n*, 321 S.C. 219, 227, 467 S.E.2d 913, 917-18 (1996) ("A justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical or abstract dispute." (quoting *Pee Dee Elec. Coop., Inc. v. Carolina Power & Light Co.*, 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983)).

On the merits, we find the ALC erred in deferring to the Department's interpretation of regulation 61-9.122 and part 200 of regulation 61-43 and in concluding Broilers were not required to apply for an NPDES permit or obtain an exemption. *See* § 1-23-610(B) (providing this court may reverse the decision of the ALC when the decision is affected by an error of law). The Department determined that because it issued Broilers a no-discharge permit—which prohibits Broilers from discharging pollutants into the waters of the state—Broilers were neither required to apply for an NPDES permit nor request a determination that they had no potential to discharge. According to the plain language of the regulations, Broilers are large CAFOs by definition because they proposed to house between 162,000 and 237,000 broiler chickens, using a dry manure handling system. *See* Regs. 61-9.122.23(b)(2) (stating a CAFO means an animal feeding operation (AFO) "that is defined as a Large CAFO or as a Medium CAFO by the terms of this paragraph," or that the Department designates as a CAFO); Regs. 61-9.122.23(b)(4)(x) (providing a large CAFO is an AFO that stables or confines 125,000 chickens or more and uses other than a liquid manure handling system). Regulation 61-9.122.2 states a CAFO comprises a point source and thus requires an NPDES permit for discharges. *See* Regs. 61-9.122.1(b)(4)(i). Under regulation 61-9.122.23(d), large CAFOs are required to apply for an NPDES permit unless they obtain a determination from the Department pursuant to regulation 61-9.122.23(f) that they have "no potential to discharge." *See* Regs. 61-9.122.23(d)-(f). Paragraph (f) provides "the term 'no potential to discharge' means that there is no potential for any CAFO manure, litter, or process wastewater to be added to waters of the State *under any circumstance or climactic condition*." Regs. 61-9.122.23(f)(1) (emphasis added). The Department's

conclusion that a "no discharge" permit—which prohibits a facility from discharging pollutants into the waters of the state—is the equivalent of a determination under regulation 61-9.122.23(f) that the facility has "no potential to discharge" is manifestly contrary to the language of the regulation, which requires the Department to make a case-specific evaluation. *See* Regs. 61-9.122.23(f)(1). The Department's issuance of a no-discharge permit did not satisfy this requirement because the Department did not specifically consider whether there was no potential for any CAFO manure, litter, or process wastewater from Broilers' proposed facilities to be added to the waters of the State "under any circumstance or climactic condition." *See id.* Simply because the no-discharge permit prohibited Broilers from discharging pollutants into the waters of the state did not mean they had no *potential* to discharge pollutants within the meaning of regulation 61-9. Rather, the Department was required to evaluate Broilers' proposed facilities to determine whether there was any potential to discharge. Thus, we conclude the ALC erred in deferring to the Department's interpretation of regulation 61-9 and in finding Broilers had "no potential to discharge" because the Department issued them no-discharge permits.

Further, we reject the Department's argument that as a result of the *Waterkeeper* decision, it no longer has authority under regulation 61-9.122.23 to require a large CAFO to obtain an NPDES permit and that such CAFOs have no obligation to seek the Department's determination that the CAFO has no potential to discharge. *See Waterkeeper All., Inc. v. U.S. Envtl. Prot. Agency*, 399 F.3d 486 (2d Cir. 2005). In *Waterkeeper*, the Second Circuit Court of Appeals concluded that, with respect to CAFOs, "unless there is a 'discharge of any pollutant,' there is no violation of the [Clean Water] Act, and point sources are, accordingly, . . . [not] statutorily obligated to seek or obtain an NPDES permit." *Id.* at 504. The court explained that "in the absence of an actual addition of any pollutant to navigable waters from any point, there is no point source discharge, no statutory violation, . . . and no statutory obligation of point sources to seek or obtain an NPDES permit in the first instance." *Id.* at 505. The South Carolina regulations at issue are based not only on the federal NPDES regulations but also upon the South Carolina Pollution Control Act, which specifically authorizes the Department to "prevent pollution." *See* Regs. 61-9.122.1(a)(1) (stating "[t]he regulatory provisions contained in [regulations] 61-9.122 and 124 implement the . . . []NPDES[] Program under . . . the Clean Water Act . . . and the South Carolina Pollution Control Act"); *see also* S.C. Code Ann. §§ 48-1-10 to -350 (2008 & Supp. 2021) (setting forth South Carolina's Pollution Control Act); § 48-1-20 (declaring it is "the public policy of the State to maintain reasonable standards of purity of the air and water resources of the State" and authorizing the

Department to "abate, control[,] *and prevent* pollution" (emphasis added)). We acknowledge the CAFO regulation in the federal NPDES section of the Clean Water Act has since been amended and now provides that a CAFO must seek an NPDES permit only if it either discharges or proposes to discharge a pollutant. 40 C.F.R. § 122.23 (2008). Here, the ALC determined *Waterkeeper* was not controlling, and as Broilers acknowledge, neither the Department nor the state has taken any action since the 2005 *Waterkeeper* decision to repeal or amend our state regulatory scheme with respect to CAFOs. South Carolina's NPDES regulations therefore remain in effect and *Waterkeeper* and the subsequent revisions to the federal regulations did not abrogate or otherwise repeal them.[5]

We acknowledge regulation 61-9.122.23 provides that even when the Department determines there is no potential to discharge, Broilers would still be in violation of the regulation if they in fact contributed pollutants to the waters of the state. Regulation 61-43 likewise prohibits discharges and provides the Department authority to enforce compliance with the no-discharge permit. The Pollution Control Act provides for criminal and civil penalties when a person "throw[s], drain[s], run[s], or allow[s] to seep, or otherwise discharges organic or inorganic matter into the waters of the [s]tate" unless that discharge is "in compliance with a permit issued by the [D]epartment." *See* § 48-1-90. Nevertheless, none of these measures equal a finding by the Department that Broilers had no potential to discharge, which our regulations require to excuse a CAFO from obtaining an NPDES permit.

Based on the foregoing, we find the ALC erred in deferring to the Department's interpretation of the regulations and in concluding Broilers were not required to apply for an NPDES permit because the issuance of a no-discharge permit constituted a determination by the Department that Broilers had no potential to discharge. We therefore reverse as to this issue and remand to the Department for further evaluation pursuant to regulation 61-9.

---

[5] As to the Department's contention the regulations contained in regulation 61-9.122 are unenforceable because they were enacted without legislative approval, the Department raises this argument for the first time on appeal. Therefore, we decline to consider this argument as an additional sustaining ground. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 421, 526 S.E.2d 716, 724 (2000) ("[A] respondent may raise an additional sustaining ground that was not even presented to the lower court, but the appellate court is likely to ignore it.").

## II. Permit Evaluation

Appellants next contend the ALC erred by accepting DHEC's interpretation of certain provisions within part 200 of regulation 61-43 and requiring Appellants to show actual discharges from other facilities. Appellants assert that in 2004, the Department issued a "Total Maximum Daily Load" (TMDL) for the Little River because its watershed had impaired water quality due to excessive levels of fecal bacteria and it identified poultry facilities as possible contributors to the impairment. Appellants argue the Department unreasonably interpreted regulation 61-43.200.70(F) and 61-43.200.140(B) to (C) when it concluded no additional requirements or setbacks were needed because "ag[riculatural] facilities are not considered as contributors to TMDL." Appellants contend the Department therefore failed to meaningfully evaluate the factors set forth in regulations 61-43.200.70(E) to (F) and 61-43.200.140(C) in issuing permits to Broilers and that the ALC erred by deferring to the Department's interpretation of the regulations. We agree.

Part 200 of regulation 61-43 governs the permitting of animal facilities. Regulation 61-43.200.70(F) provided,[6]

> The setback limits given in this part are minimum siting requirements . . . On a case-by-case basis the Department may require additional separation distances applicable to animal facilities . . . The Department shall evaluate the proposed site including, but not limited to,

---

[6] In May 2021, part 200.70(F) was revised and now provides:

> The setback limits given in Part 200 are siting requirements. The Department shall evaluate the following factors to determine if any special conditions are necessary:
>
> > 1. Latitude and Longitude;
> >
> > 2. Down-wind receptors; and
> >
> > 3. Nutrient Management Plan.

S.C. Code Ann. Regs. 61-43.200.70(F) (Supp. 2021).

the following factors when determining if additional distances are necessary:

1. Proximity to 100-year floodplain;

2. Geography and soil types on the site;

3. Location in a watershed;

4. Classification or impairment of adjacent waters;

5. Proximity to a State Designated Focus Area; Outstanding Resource Water; Heritage Corridor; Historic Preservation District; State Approved Source Water Protection Area; state or national park or forest; state or federal research area; and privately-owned wildlife refuge, park, or trust property;

6. Proximity to other known point source discharges and potential nonpoint sources;

7. Slope of the land;

8. Animal manure application method and aerosols;

9. Runoff prevention;

10. Adjacent groundwater usage;

11. Down-wind receptors; and

12. Aquifer vulnerability.

Regulation 61-43.200.140 provides:

A. There shall be no discharge of pollutants from the operation into surface [w]aters of the [s]tate (including ephemeral and intermittent streams). . . .

B. *On a case-by-case basis, the Department may impose additional or more stringent requirements for the management, handling, treatment, storage, or utilization of animal manure and other animal by-products.*

C. The following cases *shall be evaluated* for additional or more stringent requirements:

1. Source water protection. Facilities and manure utilization areas located within a state approved source water protection area.

2. 303(d) Impaired Waterbodies List. Facilities and manure utilization areas located upstream of an impaired waterbody.

. . . .

(emphases added); *see also* Regs. 61-43.200.70(E) (providing that, in making permitting decisions, "[t]he Department shall act on all permits to prevent, so far as reasonably possible considering relevant standards under state and federal laws, an increase in pollution of the waters and air of the State from any new or enlarged sources").

Chaplin, the Department's permit reviewer, testified regarding his review of the proposed facilities. The record contains the checklist summaries he completed. Chaplin testified, and the checklist summaries reflect, that in making the permitting decision, the Department considered the proximity of the projects to the Little River—an impaired waterbody located downstream from the proposed facilities. Chaplin testified, however, that agricultural facilities were not considered to contribute to the TMDL and therefore he determined no additional requirements or setbacks were needed because Broilers' facilities would not increase pollution of the waters of the state. As the ALC recognized, the regulations require the Department to evaluate sensitive areas, including areas on the impaired water bodies list, to determine if more stringent requirements or setbacks are needed. *See* Regs. 61-43.200.140(C)(2). The Department bypassed this case-specific evaluation by concluding agricultural facilities are not considered to contribute to the TMDL. This interpretation was arbitrary because the regulations required the Department to evaluate specific factors to determine whether additional setbacks

were required or additional or more stringent requirements were needed.  We therefore find the ALC erred in deferring to the Department's interpretation.  The Department should have evaluated the factors set forth in regulations 61-43.200.70(F) and 61-43.200.140(C).  *See* Regs. 61-43.200.70(E) ("The Department shall act on all permits to prevent, so far as reasonably possible, . . . an increase in pollution of the waters and air of the State from any new or enlarged sources.").[7]  Thus, we conclude the ALC erred in finding the Department complied with the regulatory requirements in issuing the permits.[8]

Based on the foregoing, we conclude the ALC erred in affirming the Department's issuance of the agricultural permits when it failed to consider all factors set forth in part 200 of regulation 61-43 in evaluating Broilers' permit applications.  We therefore reverse and remand to the Department for further evaluation pursuant to regulation 61-43.

**CONCLUSION**

For the foregoing reasons, we reverse the ALC's decision to uphold the Department's issuance of the permits to Broilers and remand to the Department for further evaluation pursuant to regulations 61-9 and 61-43.

**REVERSED AND REMANDED.**

**KONDUROS and MCDONALD, JJ., concur.**

---

[7] We acknowledge Broilers' facilities, as proposed, comply with the minimum setback requirements.  Thus, we question whether Appellants' arguments concerning additional setbacks are now moot under the current regulatory scheme.  This amendment, however, did not affect Appellants' arguments concerning whether additional or more stringent requirements were needed under regulation 61-43.200.140(C).

[8] We decline to address Appellants' remaining argument the ALC erred in requiring "evidence proving that existing permitted facilities actually increased pollution to waters of the State" because our decisions as to the prior issues are dispositive.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating the court need not address the appellant's remaining issues when the disposition of a prior issue is dispositive).